**CONTINENTAL BUSINESS ENTER-PRISES, INC.,**

v.

**The UNITED STATES.**

**No. 160-69.**

United States Court of Claims.

Dec. 10, 1971.

David Fromson, Garden City, N. Y., attorney of record, for plaintiff.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

■ This case comes before the court on defendant's motion for summary judgment. Plaintiff, Continental Business Enterprises, Inc. (CBE), is seeking to recover the amount it expended in preparing a procurement proposal which it contends was not fairly and honestly considered. We must determine whether there are factual disputes which raise a sufficient inference of arbitrary and capricious action by the Government to warrant a trial on the merits. Keco Indus., Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970). We have concluded, on the basis of the record before us, that the defendant is not entitled to summary judgment and that the case should be remanded to the trial commissioner.

On February 21, 1968, the Department of the Air Force issued an advance synopsis of its plan to procure a weighing scales system for the Air Force Flight Test Center at Edwards Air Force Base, California. The system was to be used to measure and record the weight supported by the main landing gear of the C–5A aircraft. A formal Request for Proposals was subsequently issued on March 22, 1968.

The contract contemplated that the successful proposer would design the system as well as fabricate and install it. For that reason, the Government employed performance rather than design specifications. The Request for Proposals also included general provisions applicable to fixed-price research and development contracts. This combination resulted in numerous questions from prospective proposers, and on April 19, 1968, the Government held a pre-proposal conference to discuss the technical aspects of the system. Thirteen firms attended, including CBE. Each paragraph of the specifications was discussed in detail, and no change was made in the specifications, because all technical questions were answered.

The RFP provided that each proposal would first be evaluated on the basis of its technical sufficiency, without regard to price. If a proposal was found to be technically unacceptable, the Government reserved the right to reject it without further discussion. Paragraph nine of the RFP provided:

You are cautioned to carefully review all items, conditions and specifications of this Request for Proposals prior to submission of your proposal. Your proposal should be complete in all details, since evaluation of the proposal will determine whether further consideration will be given to it and whether negotiations will be conducted with you prior to making an award. At his option, the Contracting Officer may consider your original proposal as final without extending the privilege of revising the quotation or conducting any negotiations with any offeror. The term "negotiation" does not imply that an opportunity automatically exists to submit revisions to your original proposal at will, nor does it imply that the submission of such revisions on a unilateral basis will be considered in the Air Force evaluation process.

Several proposals were submitted. Each was evaluated by a team of Air Force engineers, which determined that only the proposal of Railweight, Inc., was technically acceptable. The evaluation team rejected CBE's proposal because it displayed "a poor engineering approach," which the evaluators described as follows:

The CBE proposal does not show an acceptable approach to the problem of safety as presented in paragraph 6.4.1 and 6.4.2 on page CBE–12. This is totally unsatisfactory from a safety standpoint since the requirements clearly state that the readout console will be located beneath the fuel laden wing of the C–5A, and that a static

discharge could cause an explosion when in a fuel-air environment. The CBE proposal does not give any consideration for temperature stabilization of the electronics equipment and does not shown [sic] how the performance criteria of TR 7.1, 7.2, and 7.3 will be met when the weighing system is subjected to the environmental conditions given in TR 6.3.1 and TR 6.3.2. The CBE qualification test plan as required by Special Instructions 3–0 is unacceptable because it offers the Air Force no assurance that the electronics equipment can operate safely prior to delivery to the AFFTC.[1]

In accordance with the conclusions of the evaluation team, the contracting officer on May 21, 1968, issued notices of unacceptable proposals to the six rejected firms. Apparently before receipt of this notice, CBE's representatives went to Edwards Air Force Base on their own initiative for the express purpose of negotiating a contract for the weighing scales system. Upon their arrival, the contracting officer informed them that the CBE proposal had been rejected and that no negotiations were contemplated. However, he decided to have the project engineer explain the reasons for the unacceptability of the proposal. In meetings held May 22 and 23, 1968, the contracting officer and the project engineer gave the representatives of CBE a detailed explanation as to why the proposal was considered unacceptable.

The contracting officer notified CBE on May 24, 1968, that he was reaffirming his decision to reject its proposal. CBE immediately announced its intention to protest the award, and a formal protest was filed on May 28. Pending resolution of the protest by the General Accounting Office, the contracting officer postponed awarding the contract to Railweight. However, in August, he informed GAO that he could not further postpone the award because any additional delay would prejudice the entire C–5A program. He subsequently awarded the contract to Railweight on August 21, 1968, at a negotiated price of $205,-400.

The protests filed by CBE and two other bidders were considered by the Staff Judge Advocate of the Department of the Air Force. In an opinion of July 1, 1968, he recommended that headquarters technical personnel review the unsuccessful proposals and give an opinion as to whether any of such proposals was so technically inferior as to preclude further negotiations. His opinion stated in part as follows:

3. In the recent IBM case (47 Comp. Gen. 29), the Comptroller General said, "When the application of a mandatory benchmark test requirement results . . . in leaving one proposer, and its price is, initially at least, substantially in excess of the price of another proposer we believe the spirit and intent of 10 U.S.C. 2304(g) would not be served without further discussion to determine whether the other proposal can be improved to meet the benchmark requirement." The facts of the instant case bear striking similarities to the IBM case. In both cases, several contractors submitted proposals, but only one was found to be technically acceptable. Also, in both cases, there was a very considerable difference in price between the sole acceptable proposal (high) and nonacceptable proposals. It is also noteworthy that the technical evaluations in the file, although appearing to be very thorough, nevertheless frequently reach adverse conclusions predicated merely on the failure of the proposers to furnish certain information, and this, on occasion at least, despite the fact that there was no express requirement in the RFP for same. [Pl. Ex. 1]

Such a review was made and the Comptroller was advised that the CBE proposal failed to provide "for temperature stabilization of the electronics and to

---

1. Proposal Technical Evaluation, dated May 15, 1968, at 3 (Defendant's Exhibit 8).

show that the electronic equipment could operate safely prior to delivery."

The Comptroller General issued a decision on the protest on November 13, 1968. 48 Comp.Gen. 314 (1968).[2] CBE's principal contention there, as here, was that its proposal was technically acceptable and that the contracting officer therefore violated a statutory duty to negotiate,[3] especially since its price proposal was far less than Railweight's.[4] The Comptroller General declined to rule on the technical acceptability of the proposal, however, stating that the resolution of the question required technical judgments beyond the expertise of the General Accounting Office, and that the contracting officer's decision was a discretionary one. *Id.* at 317–18. The Comptroller's opinion did state that the contracting officer used "poor procurement procedures" because "the RFP failed to state known design requirements with sufficient particularity and also failed to include information concerning evaluation weights and standards." *Id.* at 319–20. Finally, the Comptroller General held that paragraph nine of the RFP, quoted above, in which the contracting officer reserved the right to deny any proposer the opportunity to negotiate, violated 10 U.S.C. § 2304(g) and Section 3–805 of the Armed Services Procurement Regulations. Defendant strenuously contests the legal basis of this conclusion, asserting that the contracting officer had a statutory right to employ such a provision in the RFP, and to refuse to negotiate with any offeror. Defendant also contends that, in any event, the contracting officer was not required to negotiate with CBE because its proposal was technically unacceptable.

In Heyer Prod. Co. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63 (1956), this court held that it is an implied condition of every request for offers that each of them will be fairly and honestly considered. In Keco Indus., Inc. v. United States, 428 F.2d 1233, 192 Ct. Cl. 773 (1970), we held that the *Heyer* rule extended to *all* procurement situations, and that an aggrieved bidder who makes out a prima facie case of arbitrary and capricious action by the Government is entitled to a trial to prove the merits of his claim. Accordingly, the only question to be decided now is whether the record before us is sufficient to show that there are triable issues.

CBE bases its claim of arbitrary and capricious action on two principal grounds. First, it contends that the contracting officer was under a statutory duty to negotiate, because its technical proposal was in fact acceptable and because its price proposal was admittedly far less than Railweight's. Second, it contends that the contracting officer otherwise violated the Armed Services Procurement Regulations, for the reasons stated by the Comptroller General. In his decision the Comptroller pointed out that ASPR 3–501(b) requires that the solicitation shall contain sufficient information to enable the offeror to prepare a proper proposal; that ASPR 4–105, with respect to research and development contracts, states that the "preparation and use of a clear and complete statement of work is essential to sound contracting for research and development," and that his office had previously held that a sound procurement policy requires that offerors be informed of all evaluation factors. He also found

2. The decision of the Comptroller General also considered the protests of two other offerors. We shall discuss only those parts of the decision relevant to the protest by CBE.

3. See 10 U.S.C. § 2304(g) (1970), discussed *infra.*

4. The price proposals of the seven offerors, in ascending order of price are as follows:

| | |
|---|---|
| Revere Corporation | $118,455 |
| Continental Business Enterprises | 123,400 |
| Gilmore Industries, Inc | 165,906 |
| Railweight, Inc | 213,573 |
| Ormond, Inc | 224,596 |
| C. G. Systems, Inc | 249,921 |
| Decatur Iron & Steel·Co | 508,390 |

that CBE offered to provide equipment that would meet the safety factors described in the RFP but that the proposal was rejected because it failed to provide satisfactory safeguards against vapor entry in view of the probability that the equipment would be operated in an explosive fuel-air environment. In that connection, his opinion stated:

> * * * [I]t does appear that a requirement important enough to have required proposal rejection was also significant enough to have been explicitly provided for in the RFP. [48 Comp.Gen. at 319.]

We do not now decide that a violation of any of the regulations referred to above is sufficient to permit an aggrieved bidder to recover his bid preparation costs. The facts with respect to the effect of the violation of these regulations and other facts which plaintiff may offer to show arbitrary and capricious action are matters we leave to our trial commissioner. Among these are plaintiff's sharp dispute with the Air Force report that the contract was awarded to Railweight on August 21, 1968, because of an "urgent requirement for the C–5A weighing scales system to be furnished, installed and made operational in the Weights and Balance Hangar at Edwards Air Force Base by 18 October 1968." [5] Actually, Railweight's contract was not completed and accepted until July 24, 1970, some 21 months after October 18, 1968.[6] Whether plaintiff, if given an opportunity to negotiate, could have amended its proposal within a reasonable time to meet the safety requirements specified by the contracting officer is another issue to be resolved at the trial.

■ We think that these disputed facts, plus the apparent violation of the statutory duty to negotiate, are sufficient to defeat defendant's motion for summary judgment.

■ Our procurement system is based on the premise that the Government's needs are best served when "full and free competition" exists among prospective Government contractors. To ensure competition, Congress has provided that property and services should be procured by formal advertising whenever feasible. *See* 10 U.S.C. §§ 2304(a), 2305 (1970). Although Congress recognized that many contracts would have to be negotiated, it still sought to preserve the competitive system to the maximum possible extent. Thus, 10 U.S.C. § 2304(g) (1970) provides that:

> In all negotiated procurements in excess of $2,500 in which rates or prices are not fixed by law or regulation and in which time of delivery will permit, proposals, including price, shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured, and written or oral discussions shall be conducted with all responsible offerors who submit proposals within a competitive range, price, and other factors considered * * *.

Defendant attempts to avoid the effect of section 2304(g) by contending that, under the proviso to that section, no negotiations with CBE were required, whether or not its proposal was within a competitive range. In pertinent part, the proviso states:

> *Provided, however,* That the requirements of this subsection with respect to written or oral discussions need not be applied to procurements . . . where it can be clearly demonstrated from the existence of adequate competition or accurate prior cost experience with the product, that acceptance of an initial proposal without discussion would result in fair and reasonable prices and where the request for proposals notifies all offerors of the possibility that award may be made without discussion.

We think that in its motion for summary judgment, defendant has failed to

---

5. Plaintiff's Exhibit 2.

6. Defendant's Exhibit 15, attached to Defendant's Reply to Plaintiff's Brief, dated April 16, 1971.

prove that this exception applies here. It is true that the contracting officer included a provision in the RFP in which he claimed the option to award the contract to the most qualified offeror, without granting others the opportunity to negotiate. However, the record before us does not clearly demonstrate, as the proviso to section 2304(g) *also* requires, that there existed "adequate competition or accurate prior cost experience with the product." Obviously, there was no prior cost experience here because the product had never been previously manufactured. The whole thrust of the procurement was to retain a contractor to design a completely new system which would meet the Government's performance requirements. Nor has defendant demonstrated the existence of price competition adequate enough to assure the Government that a fair and reasonable price proposal would have been received initially from the most qualified offeror. In fact, the record before us indicates to the contrary. At section 13 of the Award/Contract[7] to Railweight, Inc., the contracting officer stated that "This procurement was negotiated, pursuant to 10 U.S.C. 2304(a) (10)." Section 2304(a) (10) permits negotiation *only* where "the purchase or contract is for property or services for which it is *impracticable to obtain competition*." [Emphasis added.] Since the contracting officer himself indicated that adequate competition did not exist, and since there was no prior cost experience here, we cannot sustain the defendant's argument that it has established that section 2304(g) permitted the contracting officer to refuse to negotiate.

If we were to accept defendant's argument here and thereby permit a contracting officer to refuse to negotiate merely because he reserves such a right in an RFP, then Congress' concept of competitive negotiation would be destroyed. The obvious purpose of the proviso above is to permit a contracting officer to avoid costly and time-consuming negotiations where the circumstances of the procurement clearly indicate that a fair and reasonable price proposal will be initially received. In such circumstances, there is no compelling need for the Government to rely on written or oral discussions with numerous offerors in order to assure itself an advantageous contract. Where such circumstances are absent, Congress justifiably relied on the competitive system to obtain fair and reasonable prices. If a contracting officer could eliminate competitive negotiation merely by reserving an option to do so, then section 2304(g) would become meaningless.

■ ■ We repeat what we said in *Keco* that "the standard of proof to be applied in cases where arbitrary and capricious action is charged should be a high one. Final decisions should be based on the particular circumstances of each case." 428 F.2d 1240, 192 Ct.Cl. at 784. Because of the broad discretion vested in the contracting officer to determine whether a proposal is technically acceptable, plaintiff has an unusually heavy burden of proof in showing that the determination made in this regard was arbitrary and capricious. Plaintiff has indicated that if a trial is permitted, it will offer evidence that its proposal was engineeringly sound. While such evidence may be a relevant part of the proof required, plaintiff must show that there was no reasonable basis for the decision that its proposal was technically unacceptable in order to establish that the decision was arbitrary and capricious. The principles that are applicable when an attack is made on such discretionary determinations are well stated in M. Steinthal & Co. v. Seamans, No. 24,595 (D.C.Cir. Oct. 14, 1971):

* * * The court is obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis. This inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such

---

7. Exhibit 13 of Defendant's Motion for Summary Judgment.

discretion extends not only to the evaluation of bids submitted in response to a solicitation but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements. * * * If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations [Slip op. at 22–23 (footnotes omitted).]

We realize that questions of technical acceptability will be difficult ones for this court. But we cannot deny legal rights merely because of the complexity of their resolution. Moreover, if we were to hold otherwise, then every offeror's right to have his bid fairly and honestly considered could be cut off by an arbitrary determination of technical unacceptability. Such a result would thwart the intent of the *Heyer* and *Keco* cases.

█ Our decision in *Keco* was premised at least in part on the feeling that aggrieved bidders have the right to require the Government to enforce the statutes and regulations fairly and honestly, either by seeking equitable relief in the Federal district courts or by suing for money damages here.

In requesting that we reconsider our holding in *Keco*, defendant asserts that permitting suits such as the present one could create serious problems in maintaining a smooth and effective procurement system. We have not been told what these problems will be, but we doubt that our holding today will jeopardize the procurement process. Certainly, a suit for damages in this court after the completion of the contract will not disrupt the procurement process as much as an injunction issued before the contract is awarded. M. Steinthal & Co. v. Seamans, *supra*. Moreover, the standard of proof which we require in cases such as this will undoubtedly discourage frivolous lawsuits, and we do not think that contracting officers will feel intimidated or harassed by a ruling which requires their agencies to pay damages to a contractor when it is established that he has sustained a loss as a result of arbitrary and capricious action by the procurement officials.

In addition, we are reluctant to limit *Keco* in the absence of some compelling reason, because of the public interest in preventing arbitrary and capricious governmental action. The *Heyer* rule was extended in *Keco* to give aggrieved bidders a damages remedy in lieu of the equitable remedies available in the Federal district courts after Scanwell Lab. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). In such a suit for damages after completion of the procurement, the merits of each claim can be considered without the time pressures attendant to expedited actions for injunctive relief. Apparently the necessity for such an alternative remedy is even greater than it was when we decided *Keco* because of the difficulties experienced by the district courts in handling *Scanwell*-type cases. See, M. Steinthal & Co. v. Seamans, *supra*.

Defendant's motion for summary judgment is denied and the case is remanded for a trial in accordance with this opinion.