**REEL-O-MATIC SYSTEMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 635-88C.

United States Claims Court.

Jan. 3, 1989.

Glenn J. Sedam, Jr., Fairfax, Va., for plaintiff. Edward C. Culbertson, Sedam & Shearer, of counsel.

William K. Olivier, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Captain Peter J. Comodeca, Judge Advocate General's Office, Dept. of the Army, and Joyce A. Oblon, General Counsel's Office, Small Business Admin., of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after trial on the complaint of plaintiff Reel–O–Matic Systems, Inc. ("plaintiff"), for injunctive relief.

## BACKGROUND

At the conclusion of plaintiff's case,[1] defendant moved for involuntary dismissal pursuant to RUSCC 41(b) on the ground that upon the facts and law plaintiff had shown no right to relief. On November 22, 1988, the court granted defendant's motion for the reasons stated from the bench, advising that a written opinion containing the findings of fact required by Rules 41(b) and 52(a) would issue within 30 days after the official transcript of proceedings had been filed with the Clerk of the Court. An order entered on November 23, 1988, denying plaintiff's request for permanent injunctive relief with ultimate findings of fact and conclusions of law in support of that ruling.

## FACTS

The following facts derive from trial and the proposed findings of fact submitted by

---

1. This case had been scheduled for trial by order entered on November 8, 1988, to begin on November 21 and was transferred to this court to conduct trial. It was this court's view, stated at the outset of trial, that this matter should have proceeded on cross-motions for summary judgment, with affidavits as necessary to complement a record review. Thereafter, defendant represented that it had advised the then-presiding judge that, in defendant's view, since plaintiff was challenging a decision of the Small Business Administration (the "SBA") declining to award plaintiff a Certificate of Competency ("COC"), the nature of the judicial inquiry should be confined to record review, rather than trial at which the *dramatis personae* of the SBA who made the decision would be required to testify in support of the agency decision. Since counsel and the parties were prepared for trial, defendant previously had not formalized its position, and the Government had agreed to withhold performance on the subsequently awarded contract only through November 23, 1988, prudence dictated following the course that had been charted before transfer by trying the case.

the parties before trial. Plaintiff filed its lawsuit pursuant to 28 U.S.C. § 1491(a)(3) (1982), to enjoin award and performance of a contract pursuant to a May 13, 1988 solicitation by the Department of the Army Tank Automotive–Command ("TACOM"), Warrenton, Michigan, denominated as No. DAA07–88–B–JK330, for 41 cable reel trailers. The contract had been designated as a Small Business set-aside calling for completion 270 days after award. On or about June 10, 1988, plaintiff submitted a bid pursuant to the solicitation.

The contracting officer [2] determined that the lowest bidder was non-responsible. That contractor did not carry the matter further. Plaintiff was the second low bidder and was also found non-responsible. Following the non-responsibility determination, the contracting officer issued an award of the contract on November 3, 1988, to the third lowest bidder, Dynaweld, Inc. ("Dynaweld"). The award was duly dispatched by United States mail to Dynaweld. The parties agreed that before the award was received by Dynaweld, plaintiff commenced this bid protest action. The parties also agreed that the award was not consummated until such time as Dynaweld received notice of the award and that jurisdiction over this pre-award bid protest properly had attached in the United States Claims Court. *F. Alderete Gen. Contractors, Inc. v. United States*, 715 F.2d 1476, 1480 (Fed.Cir.1983).

In 1983 TACOM had awarded a contract for seven cable reel trailers to plaintiff, Contract No. DAAE07–83–C–1356 ("Contract 1356"). Performance of Contract 1356 occurred at plaintiff's Wrightsville, Pennsylvania ("Wrightsville") plant between 1983 and 1987. Plaintiff was 1253 days late in delivering the seven trailers required by the contract.

Plaintiff's President John D. Schrott, Jr., testified at trial that, during the final phase of delivering Contract 1356, plaintiff attained a delivery rate for the last four cable reel trailers of one every 45 days.

On cross-examination Mr. Schrott, Jr., estimated that he was actively involved in management during 800 days of the delay. Although 25 contractual discrepancies were noted in the first production vehicle, nine of which were remedied during inspection of the first production vehicle, TACOM accepted all the trailers delivered under Contract 1356.

Contract 1356 was performed by plaintiff prior to and during a Chapter 11 bankruptcy proceeding commenced on September 23, 1986, by which plaintiff sought protection from its creditors. Although plaintiff was entitled, under 11 U.S.C. § 365 (1982), to petition the bankruptcy court to permit rejection of Contract 1356 as part of plaintiff's protection under the bankruptcy proceeding, plaintiff elected to reaffirm its contractual commitment to TACOM and to perform as agreed. By that time plaintiff had received full progress payments on Contract 1356. Plaintiff's plan for reorganization was confirmed on September 13, 1988.

After the apparent low bidder was disqualified, plaintiff, now the apparent low bidder, received notice that a pre-award survey would be conducted by the Defense Contract Administration Services (the "DCAS").

For the first half of 1988, plaintiff was in the process of arranging for the acquisition of a manufacturing site which would permit expanded operations. In February 1988 Lakes Development Corp. ("Lakes") became the parent company of plaintiff. On or about March 21, 1988, Lakes signed a contract to purchase a 40,000 sq. ft. plant in Oklahoma City, Oklahoma. Closing on the purchase took place on or about July 13, 1988. Lakes leased the Oklahoma City facility to plaintiff by lease dated July 15, 1988. As part of the pre-award proceedings, a DCAS survey of the Oklahoma City facility was conducted out of the DCAS Dallas, Texas office; the survey of Wrightsville was conducted out of the DCAS office in Reading, Pennsylvania.

**2.** All references to the contracting officer include the contracting officer's designee, Contract Specialist Cheryl Rehs.

Concurrently with the preaward surveys performed by the DCAS on behalf of TA-COM, plaintiff was in the process of relocating its operations from the Wrightsville facility to Oklahoma City. Along with this relocation, Lakes acquired additional manufacturing equipment, which it leased to plaintiff, to exploit the greater space available in Oklahoma City.

The Oklahoma City survey by the DCAS would not have been conducted at all, despite the relocation of all plaintiff's operations, if plaintiff had not insisted on performance of a survey in Oklahoma City. The pre-award survey conducted by the DCAS Dallas office of plaintiff's Oklahoma City facility found plaintiff's production capability and technical capability satisfactory and recommended a complete award as of September 8, 1988.

The DCAS Dallas office based its finding that plaintiff's production capabilities were satisfactory on 1) plaintiff's ability to implement adequate production and planning control systems; 2) plaintiff's ability to hire personnel from the Oklahoma City area to fill necessary skilled and unskilled labor categories; 3) the availability of additional plant facilities and equipment; and 4) an assessment that plaintiff's overall performance history had been satisfactory. The DCAS Dallas office also found that plaintiff had satisfactory technical capability, concluding that plaintiff had "demonstrated an adequate understanding of the requirements and management capability to perform."

The pre-award survey conducted by the DCAS Reading office of the Wrightsville location found plaintiff's production capability unsatisfactory. The DCAS Reading office noted that two of plaintiff's three most recent government contracts were delinquent. A 1987 contract for one cable reel trailer was 84 days late, and a 1983 contract for seven cable reel trailers was 256 days late despite several contract extensions which were granted for a total of 997 days. This ultimately resulted in a delay of 1,253 days from the original delivery date. (This was Contract 1356.) A third contract, No. N62992-87-06570 in

1987, for a single cable reel trailer was performed early. The delinquencies were attributed to plaintiff's poor production control.

The DCAS Reading office's financial survey cited financing available to plaintiff of $128,000 from Lakes and $426,000 from the State of Oklahoma in support of its finding that plaintiff had satisfactory financial capability.

The contracting officer went beyond both the Wrightsville and Oklahoma City surveys in finding that plaintiff's financial capability was inadequate to meet performance requirements. The contracting officer concluded that the satisfactory rating for Wrightsville was based upon the availability of progress payments. Since progress payments would not necessarily be available, the contracting officer concluded that the the DCAS Reading office's ratings had no merit. The contracting officer's conclusion was also based on plaintiff's lack of an acceptable accounting system and the DCAS' improper reliance on a 1982 Robert Morris Annual Statement. The contracting officer noted that plaintiff's response to the solicitation stated that plaintiff could perform in Wrightsville or in Oklahoma City. However, plaintiff identified the inspection and acceptance points and delivery of FOB origin as Wrightsville.

The contracting officer also recommended against award based on plaintiff's technical capability, relying solely on past performance under Contract 1356, and on production capability, concluding that plaintiff had not committed sufficiently to an on-time delivery schedule. According to the contracting officer, plaintiff had not demonstrated that past performance problems would not recur under the proposed contract.

Despite the findings of the Dallas and Reading DCAS surveys that plaintiff's quality control was satisfactory, the contracting officer had a problem with plaintiff's Quality Assurance Program. The contracting officer believed it improper to give a satisfactory rating based upon an understanding of the quality assurance requirements. The contracting officer cited

1) insufficient procedures in place, 2) improper reliance on personnel otherwise engaged to perform inspection tasks, 3) insufficient number of inspectors, and 4) failure to have acquired test equipment.

On September 27, 1988, the TACOM contracting office referred the contracting officer's nonresponsibility determination to the Small Business Administration (the "SBA"). The SBA reviews an application for a Certificate of Competency ("COC") upon a finding by the contracting officer administering a given invitation for bids that a bidder is nonresponsible, *i.e.*, lacks the technical, managerial, and/or financial resources required for performance of the contract.

By letter dated September 30, 1988, the SBA informed Mr. Schrott, Jr., that the Army found the firm to be nonresponsible for the subject procurement, that plaintiff could appeal this decision by applying for a COC, and that it should submit detailed information in support of its application. Plaintiff notified the SBA, by letter dated October 10, 1988, that it was applying for a COC and provided extensive documentation. The SBA had requested several categories of information for its review of plaintiff's application for a COC. The categories are set forth in the SBA letter and an appendix entitled "List of Data Required." Plaintiff's response followed the format of the SBA letter and appendix in identifying the responsive materials in the three binders of documentation provided by plaintiff.

In responding to the SBA's request for information, plaintiff listed Lakes as 100 percent owner of the voting block or business on SBA form 355, entitled "Application for Small Business Size Determination."

On October 12, 1988, the SBA Harrisburg Branch Office performed a financial evaluation. The financial review was based on information in SBA files, information submitted by plaintiff, and a telephone conversation with Mr. Schrott, Jr. The financial review recommended that a COC not be issued due to the lack of complete financial information, as follows: 1) the financial statement was an unaudited, *pro forma* statement and did not provide a complete financial picture; 2) Mr. Schrott, Jr., refused the SBA's request to submit financial information on affiliated companies; 3) a Chapter 11 reorganization plan provided for weekly payments to the IRS for four years totaling $250,000.

In his notes on the financial analysis of plaintiff, James L. Higgins, the SBA's Acting Assistant Regional Administrator for Finance and Investment, states that plaintiff "continues to operate under Chapter 11 Bankruptcy Plan." The notes do not reflect that the Bankruptcy Court entered an order on September 13, 1988, confirming the plan and discharging covered plaintiff's debts by the plan; that no appeal was taken on the plan; and that it became final. Plaintiff's plan paid off all answered creditors proposed in the plan and provided for paying off an IRS obligation over four years. Plaintiff is negotiating with unsecured creditors who did not accept the plan.

On October 18, 1988, Industrial Specialist William W. Wertz performed a survey of the firm's facility in Wrightsville and discussed the procurement with Mr. Schrott, Jr. There is no evidence why the SBA could not have assigned the matter to an office with cognizance over the Oklahoma City facility.

The Industrial Specialist recommended that a COC be denied based on the following grounds, among others:

1) The firm did not provide written resumes of the management personnel or labor force that it intended to hire at the Oklahoma City facility;

2) The firm did not demonstrate that it had sufficient production, management, supervisory, or engineering staff to provide the trailers in a timely fashion;

3) The facility in Oklahoma City did not have a proved production capability, because all machines and assembly operations were new and were not installed at the time the Industrial Specialist conducted his survey;

4) The firm did not have an adequate quality assurance system in place to con-

trol the manufacture of the required trailers, nor was there proof that the firm had implemented a corrective action plan; and

5) The firm had an unsatisfactory performance record in the past on the same type of contract; its plans to rectify the situation at the time of the survey were unproven; it would be speculative to credit the firm's ability to be prepared to perform on time for TACOM.

The Industrial Specialist observed that although other unrelated contracts were performed satisfactorily, the firm was late in the past year on one of two similar type contracts that it performed and its past performance record on Contract 1356, for the exact same type of trailers, was unsatisfactory. According to Mr. Wertz, at the time of the industrial survey, plaintiff had a Quality Assurance plan to rectify these problems, but it did not conform to the prototype that it sought to follow.

The SBA's COC Review Committee met on October 26, 1988, to determine whether a COC should issue. The committee members were Thomas McGrath, Chief of Procurement Assistance; Mr. Higgins, Acting Assistant Regional Administrator for Finance and Investment; Robert Hall, Regional Counsel (all three of the Philadelphia Regional Office); and Mr. Wertz, the Industrial Specialist (of the Richmond, Virginia office). The COC Review Committee unanimously recommended that a COC be denied to plaintiff. Denial of the COC was based upon the firm's technical capacity, labor resources, quality control, and past performance record which the procuring agency and the Industrial Specialist had found to be unacceptable. Also, according to the SBA's written decision, the financial review showed that the financial information provided was inadequate to support a COC.

The trial testimony of Messrs. Higgins and Wertz revealed that the former was not familiar with the status of Chapter 11 proceedings or the identity of plaintiff's owners. The latter's conclusions were overstated, but Mr. Wertz's notes were somewhat more lucid. The testimony of these witnesses and a comparison of Mr.

Wertz's report with the final COC Review Committee's decision revealed that Mr. Wertz's views were the aegis for denying the COC.

By letter dated October 26, 1988, the SBA informed plaintiff that it lacked the technical capability and required quality assurance program, that its past performance was unsatisfactory, and that the financial information reviewed would not support a positive recommendation for award of a COC.

## DISCUSSION

In *Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1568 (Fed.Cir.1984), the Federal Circuit stated:

The trial judge, in passing on a rule 41(b) motion in a case tried to the court, may weigh and consider the evidence and sustain defendant's motion even though plaintiff's evidence establishes a prima facie case that would preclude a directed verdict for defendant in a jury case.

...The district court must look also to the evidence elicited contrary to plaintiff's position, evaluate and resolve conflicts in the evidence, and either enter an appropriate judgment against the plaintiff or decline to render any judgment until the close of all the evidence.

(Footnotes omitted.)

*NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed.Cir.1986), articulated the standard for a Claims Court review in a bid protest case, which is suit for breach of an implied contract to treat the contractor's bid fairly and honestly:

A breach occurs in such situations if the contracting agency acts in an arbitrary and capricious, *i.e.*, irrational or unreasonable, manner in rejecting the bid. The Claims Court should be allowed to enjoin the agency from awarding contracts, and thereby interfere with the procurement process, "only in extremely limited circumstances."

805 F.2d at 376 (quoting *CACI, Inc.—Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) [quoting *United States v. Grimberg*, 702 F.2d 1362, 1372 (Fed.Cir.

1983) ] (other citations omitted). Alternatively, the contractor can establish a " 'clear and prejudicial' violation of a procurement statute or regulation." *CACI Field Serv., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (per curiam) (quoting *Kinetic Structures Corp. v. United States,* 6 Cl.Ct. 387, 394 (1984)). In holding that the contractor failed to contest findings relating to the prejudice requirement, the Federal Circuit in *CACI Field Services, Inc.,* quoted the following language from *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 573, 492 F.2d 1200, 1203 (1974); "[I]f one thing is plain in this area it is that not every irregularity, no matter how small and immaterial, gives rise to the right to be compensated for the expense of undertaking the bidding protest."

■ In order to prevail, a contractor thus must establish that the contracting officer's decision to award the contract to another contractor had no rational basis or that in making his award, the contracting officer violated an applicable procurement statute or regulation and in a manner prejudicial to the protesting bidder. The Federal Circuit has not held that this evidentiary burden must be discharged by clear and convincing evidence, a standard which defendant parades before the Claims Court in every bid protest case without citing this court's discussions in *DLM & A, Inc. v. United States,* 6 Cl.Ct. 329, 331 (1984), and *Quality Transport Services, Inc. v. United States,* 12 Cl.Ct. 276, 281 (1987). Both these opinions point out that the line of cases supporting the notion that a government contractor should be required to establish its entitlement in a breach case by the type of evidence apropos to a fraud claim is unique to some judges of the Claims Court and that no valid decisional law supports it.

Unquestionably, the Claims Court has jurisdiction to review the COC determination. *Cavalier Clothes, Inc. v. United States,* 810 F.2d 1108 (Fed.Cir.1987) (*approving Related Indus., Inc. v. United States,* 2 Cl.Ct. 517 (1983)). Plaintiff does not take the position that the contracting officer's finding of nonresponsibility and referral to the SBA was either irrational or contrary to regulation. *See PNM Constr., Inc. v. United States,* 13 Cl.Ct. 745 (1987). Rather, plaintiff challenges the SBA's COC determination both on the merits and as to the manner in which the underlying investigation was conducted.

■ The Federal Acquisition Regulations ("FAR") by 48 C.F.R. § 9.104–1 (1988), prescribe general standards by which a prospective contractor's responsibility is judged:

To be determined responsible, a prospective contractor must—

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104–3(b));

(b) *Be able to comply with the required or proposed delivery or performance schedule,* taking into consideration all existing commercial and governmental business commitments;

(c) *Have a satisfactory performance record* (see 9.104–3(c));

(d) Have a satisfactory record of integrity and business ethics;

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, and quality assurance measures applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104–3(b));

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104–3(b)); and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

(Emphasis added.) FAR § 9.104–3(c) covering application of these standards provides, in pertinent part:

*Satisfactory performance record. A prospective contractor that is or recently has been seriously deficient in contract performance shall be presumed to be nonresponsible,* unless the contract-

ing officer determines that the circumstances were properly beyond the contractor's control *or* that the contractor had taken appropriate corrective action. Past failure to apply sufficient tenacity and perseverance to perform acceptably is strong evidence of nonresponsibility. The contracting officer shall consider the number of contracts involved and extent of deficiency of each in making this evaluation. Prior compliance with subcontracting plans required by Subpart 19.7 shall be considered in determining the responsibility of an offeror bidding on a contract requiring a subcontracting plan.

(Emphasis added.)

Defendant invokes this presumption based on plaintiff's performance record with respect to Contract 1356, which called for the identical type of trailer, and on the late delivery associated with one of the two government contracts performed within the preceding year. It was plaintiff's past performance record in view of FAR § 9.104–3(c) that was determinative to the SBA in declining to issue a COC. The reasoning supporting the COC Review Committee's decision was discussed by the cognizant personnel who testified at trial. Largely adopted as the SBA's decision were the views of Industrial Specialist Wertz. His opinion invoked the presumption of section 9.104–3(c):

> Firm's performance record on past exact same contract is unsatisfactory. ·Reel-O–Matic has attempted to rectify these [d]ifficulties by enlarging their capacity (new facility in Oklahoma), hiring new technical qualified personnel (engineers, QA & Hyd.) but as of this time all are unproven and only a speculation as to their ability to put the manpower, materials, QA and facilities including training of a[n] all new work force together and deliver trailers to specification on time for TACOM.

Mr. Wertz's ultimate recommendation follows:

> Based on the evaluation of the firm[']s facility, personnel, capacity and equipment, it is the opinion of the I/S that Reel–O–Matic System, Inc. of Wrightsville, Pennsylvania cannot and will not meet the quantity, quality, delivery schedule and/or any other requirements of the proposed contract. It is recommended that a Certificate of Competency be denied for ROM System, Inc. from a capacity standpoint.

Although Mr. Wertz's report was seriously flawed as to the number of resumes of personnel that had been provided and its understatement of plaintiff's quality assurance efforts that had been undertaken to date, his opinion in the main was corroborated by the testimony of plaintiff's own witnesses.

Joseph J. Liston, plaintiff's Account Executive and Quality Control Director since August 1, 1988, with 13 years experience as a Quality Control Engineer, reviewed with Mr. Wertz plaintiff's manual for quality control that Mr. Liston had developed. The latter testified that he was not familiar with plaintiff's past problems and that the existing quality assurance records were. "not to my liking." The court compared Mr. Liston's manual with the SBA's "sample manual" and found that, although Mr. Liston's approach holds promise, it was deficient in significant enough respects to support Mr. Wertz's lack of confidence in it. For example, the purchase order control, receiving inspection, and faulty material control provisions were inadequate.

Robert W. Davis, plaintiff's Manager of Special Services, Technical Services, is a highly experienced engineer who has worked for plaintiff since March 1988. Mr. Davis testified that since August 1, 1988, he had upgraded the machinery, disbursing, and ordering practices in the Oklahoma City facility. He had not seen the submission plaintiff made to the SBA in connection with the COC determination; indeed, the SBA interviewers had made no effort to talk to him, since the SBA review was confined to the Wrightsville facility. By the second week in October, 1988, Mr. Davis said that half the production equipment had been delivered and that beginning on October 15 plaintiff could have delivered product under the contract.

Specifically, Mr. Davis testified that initially plaintiff could produce one trailer called for under the contract per month and could now produce one a week. Mr. Davis made no allowance for time to produce different trailers called for by the contract, regardless of the degree of complexity. Since there were 41 trailers called for, five of which were similar to those produced under Contract 1356, and 36 of a more simple design, Mr. Davis' testimony projected completion of the contract in 287 days when the contract period was 270 days. The completion time would be the same for all trailers based upon his conclusion that none of the trailers were complicated. Even though the SBA's COC determination did not rely on Mr. Davis' assessment of plaintiff's production capability, the witness' testimony bolstered, and does not detract in any way from, the rationality of the SBA's determination that plaintiff had not demonstrated an ability to make timely delivery.

The SBA's financial review faulted plaintiff for failing to submit financial information on W.W.S. Inc., "a non-operating shell company" that formerly owned plaintiff, according to Mr. Schrott, Jr. In Mr. Schrott, Jr.'s view, W.W.S. Inc., was not affiliated or related to plaintiff. However, W.W.S. Inc., is owned by Mr. Schrott, Jr., and his father. Pursuant to 13 C.F.R. § 121.3 (1988), an SBA regulation, W.W.S. Inc., qualifies as an affiliate per section 121.3(a)(vi) (control through common management) and section 121.3(a)(vi)(A) (interlocking management). The evaluation of witness Robert W. Howerter, the SBA Loan Officer providing the underlying information to Mr. Higgins, properly noted that plaintiff had submitted insufficient financial information with respect to its affiliates. Mr. Howerter defined affiliate as a company related by common ownership. This definition comports with the concerns of section 121.3(a) and the justification for the request for information made by the SBA.

█ Plaintiff charges broadly that the SBA did not fulfill its mandate "to [aid] small business firms to obtain a fair share of federal government procurement contracts." 13 C.F.R. § 125.3. Specifically, plaintiff argues that the SBA was required to send a team to visit plaintiff's Oklahoma City facility pursuant to FAR § 19.602–2(a)(2). Plaintiff's complaint is well taken. Indeed, Mr. Wertz, who works out of Richmond, Virginia, insisted on meeting Mr. Schrott, Jr., at the Wrightsville facility and took no steps to refer the matter to the SBA regional office that could accommodate an inspection of the Oklahoma City facility where production was to take place. However, plaintiff had bid on the contract specifying that production could take place at either facility. Since the process for making the COC determination must be completed within 15 business days, FAR § 19.602–2(a), and because plaintiff had designated both production facilities in its bid, the regulation was violated more in spirit than fact.

13 C.F.R. § 125.5(e) appears to conflict with the FAR's version of what the SBA is supposed to accomplish in a COC determination, since the former provides: "Upon timely receipt of required documentation, SBA personnel *may* be sent to the firm to review the responsibility of the applicant ...." (Emphasis added.) The Federal Circuit's decision in *CACI Field Services, Inc.,* 854 F.2d at 466, requires a clear and prejudicial violation of regulation to overturn a decision of this nature. It is not necessary to resolve the tension between the SBA's views of its responsibility in making a COC determination and the Federal Acquisition Regulations' interpretation of the SBA's responsibility, since plaintiff has not demonstrated that it was prejudiced by any violation of the FAR regulation. The deficiencies which the court has outlined in this opinion that were sufficient to render the SBA's denial of the COC rational do not depend on whether or not the SBA had sent an Industrial Specialist to the Oklahoma City facility. Such a visit may have inspired more confidence in plaintiff's production capability, but the thrust of the SBA's views, as borne out by Messrs. Liston's and Davis' testimony and the absence of financial data on W.W.S. Inc., would have remained the same.

In the circumstances there is no basis for a finding that the denial of the COC was irrational or that plaintiff was prejudiced by the violation of an applicable procurement regulation.

## CONCLUSION

Based on the foregoing, plaintiff has shown no right to relief, and defendant is entitled to a grant of its motion pursuant to RUSCC 41(b). Accordingly,

IT IS ORDERED, as. follows:

Judgment shall enter for defendant, and the Clerk of the Court shall dismiss the complaint.

No costs.