**HEALTH SYSTEMS MARKETING &
DEVELOPMENT CORPORATION,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1116C.

United States Claims Court.

Sept. 30, 1992.

Howard G. Slavit, Washington, D.C., for plaintiff. Steven J. Wadyka, Jr., of counsel.

Jane W. Vanneman, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C., for defendant. Gary Winter, Agency for Intern. Development, of counsel.

## OPINION

BRUGGINK, Judge.

This is a suit to recover bid proposal preparation costs. Plaintiff is a disappointed bidder in a negotiated procurement. Defendant terminated negotiations, allegedly because plaintiff's cost proposals were non-responsive. Defendant has moved for summary judgment.[1] For the reasons that follow, the motion is denied.

### FACTUAL BACKGROUND [2]

The parties agree as to some of the background circumstances. Other, more particular facts, are discussed in the context of determining whether a relevant dispute of fact exists.

The Agency for International Development ("AID") and the Government of Chad ("GOC") entered into an agreement known as the Chad Child Survival Project ("CCSP"). Under the CCSP, AID was to provide U.S.-funded support to Chad's Ministry of Public Health to plan and deliver maternal and child health care services to combat Chad's infant and maternal mortality rates. The parameters of the CCSP were set by the Project Paper, which was approved by the AID representative to Chad on August 29, 1989. AID began searching for a minority-owned company to provide the Technical Assistance ("TA") portion of the project.

Plaintiff, Health Systems Marketing and Development Corp. ("HSMD"), is a United States corporation founded in 1984 by Dr. James G. Barnes. It provides health care consulting and related services. HSMD was aware of and interested in the project

---

1. The government moved to dismiss or in the alternative, for summary judgment. The motion to dismiss was denied on June 12, 1992.

2. The findings herein are limited in effect to the ruling on the motion for summary judgment.

and submitted a concept paper to AID on October 25, 1989. Following an informal selection process involving other contractors, AID/Chad and the GOC selected HSMD for further negotiations based on HSMD's Concept Paper. On March 25, 1990, AID's Acting Assistant Administrator for Africa made a determination to limit competition on the TA contract to HSMD. This decision was made because HSMD did not fit the relevant requirements of the Small Business Administration ("SBA") minority set-aside program. To have submitted the TA contract to SBA regulations would have delayed commencement and contract performance beyond the time the GOC was willing to wait. On March 27, 1990, AID signed an Action Memorandum allowing it to negotiate solely with HSMD, waiving a new SBA requirement.[3] Thus, the TA contract was negotiated rather than competitively bid.

On June 9, 1990, HSMD submitted its Technical and Business Proposals to the Regional Contracting Officer ("RCO") for AID in Africa, Mr. Carlton Bennett. On June 28, 1990, Mr. Bennett wrote to Dr. Barnes indicating that HSMD was authorized to pay the costs of bringing candidates to Washington to interview them as possible staff members. Those interviews were held the week of July 8, 1990. Mr. Bennett wrote to Dr. Barnes again on July 11, 1990 indicating that HSMD was authorized to incur the costs of flying to Chad for meetings with AID officials which were scheduled to begin on July 31, 1990. Shortly before that, on July 23, 1990, HSMD submitted its revised Technical and Business Proposals to AID officials.

A series of meetings was held in Chad between July 31 and August 7, 1990 the purpose of which was to iron out the remaining differences that existed between AID, HSMD and the GOC, chiefly with respect to costs and to the specific scope of responsibilities that HSMD would have in Chad. One particularly contentious point was the amount of administrative "backstopping" that HSMD included in its proposal. "Backstopping" is the term used for the support provided by the home office to the employees in the field. The parties disagree sharply as to both the content and the outcome of these negotiations.

HSMD submitted another revised cost proposal to the RCO on August 20, 1990. On October 10, 1990, AID terminated negotiations with HSMD. Fourteen days later, HSMD filed a protest of the termination with the General Accounting Office ("GAO"). That protest was denied on March 5, 1991.

## DISCUSSION

### a. Whether the claim is non-justiciable

■ The motion for summary judgment posits six questions. The first three can be quickly eliminated. Defendant begins by asking whether the claim is non-justiciable because of its foreign policy implications. The government argues that the court should grant summary judgment in its favor because the case involves issues of foreign policy which cannot be reviewed by this court. Resolving plaintiff's claim on the merits would involve the court in second-guessing foreign policy decisions of the executive branch, thereby violating the doctrine of separation of powers.

If the predicate to defendant's argument were correct—that the decision to terminate negotiations was a foreign policy matter—it would have a sounder position on summary judgment. In fact, however, the documents strongly suggest that it was purely a contracting decision, made out of AID's frustration with Dr. Barnes and HSMD. At this stage of the development of the record it appears that the disposal of this case will not require any investigation of discussions between AID and the GOC. Hearing plaintiff's claim would not appear to directly implicate AID's conduct of foreign policy with respect to the GOC. HSMD has raised issues of public contract

---

**3.** Regulations allow the SBA to set aside a certain amount of public contracts to be awarded to socially disadvantaged business owners. 15 U.S.C. § 637(a). In 1988, Public Law 100–656

(set out at 15 U.S.C.A. § 644 (West 1991)) was passed, requiring all 8(a) contracts worth more than $3 million to be competitively bid. It was from this requirement that HSMD was excepted.

negotiation only. It does not seek to litigate the political and social wisdom of AID's foreign policy, or to challenge the legality of AID's implementation of that policy. *See DKT Memorial Fund, Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C.Cir.1987); *Population Inst. v. McPherson*, 797 F.2d 1062, 1068–70 (D.C.Cir.1986). HSMD seeks redress of what it claims is AID's bad faith in negotiations with it. The foreign policy issues are, at best, tangential to the negotiations involved here. We agree with the Comptroller General that "our policy of reviewing contracts awarded under Federal grants does include grants to foreign governments." *Niedermeyer–Martin Co.*, 59 Comp.Gen. 73, 76 (1979).

b. *What is the effect of the GAO decision?*

The second question posed by the motion has two parts: "Whether the decision of the GAO was rational and whether AID did not act arbitrarily and capriciously in following GAO's recommendation." As explained below, the first part of the question is legally irrelevant. The second part is legally relevant, but factually insupportable.

██ The government contends that we are limited to reviewing the GAO decision, and in the absence of clear error, we are bound to uphold it. However, the existence of a GAO decision does not limit this court to a review of that decision. Being by its very nature an advisory opinion, the GAO decision is not controlling on the parties or on this court. Nor do we act as an appeals court for the Comptroller General's decisions. Instead, we make a de novo review of AID's decision to terminate negotiations with HSMD.

*Honeywell, Inc. v. United States*, 870 F.2d 644 (Fed.Cir.1989), is not to the contrary. In that case, the Army had disqualified a bidder, HazTad. HazTad sought review in the GAO, which recommended that HazTad get the award. The Army decided to follow that recommendation, and that decision was then challenged in the Claims Court by Honeywell. On appeal from a decision setting aside the award to HazTad, the Federal Circuit held that the Claims Court should have limited its review to determining whether the Army's decision to follow the GAO's recommendation had a reasonable basis. The court relied on *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), where the issue was framed as whether it was "justifiable for the contracting officer to follow the general policy of acceding to the views of the Accounting Office in this area even though he had another position on the particular issue of legality or propriety." *John Reiner*, 163 Ct.Cl. at 390, 325 F.2d at 442.

██ In the instant case, on the other hand, AID's decision to break off negotiations could not have been made in reliance on the GAO decision, which came after all the actions at issue here were complete. The only question before us, therefore, is whether the agency's decision, unaffected by GAO counsel, was rational. *See Compliance Corp. v. United States*, 22 Cl.Ct. 193, 198 (1990), *aff'd*, 960 F.2d 157 (Fed.Cir. 1992). In making that assessment, however, it is permissible for the court to consider and give appropriate weight to the GAO decision. We recognize that "[j]udicial intrusions into the procurement process are generally limited, circumspect and infrequent." *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). Moreover, because of its expertise in procurement matters, the GAO decision can "provid[e] an opinion for purposes of evaluating the procurement herein." *Technology for Communications Int'l, Inc. v. Garrett*, 783 F.Supp. 1446, 1449 n. 6 (D.D.C.1992); *see also Planning Research Corp. v. United States*, 971 F.2d 736 (Fed.Cir.1992).

c. *Are there material facts in dispute?*

The three remaining questions raised in the motion for summary judgment raise relevant issues, one procedural, the others substantive, going directly to plaintiff's entitlement to relief: whether there are material facts in dispute, whether the AID decision to terminate negotiations was arbi-

trary, capricious, or an abuse of discretion, and finally whether AID acted in bad faith in terminating negotiations.

■ Plaintiff's claim for pre-bid proposal costs arises out of an implied-in-fact contract with AID which arose when HSMD submitted a bid in response to AID's solicitation. *Harris Sys. Int'l, Inc. v. United States,* 5 Cl.Ct. 253, 260 (1984). Under this contract AID is obligated to give HSMD's proposal fair and honest consideration. *Heyer Prods. Co. v. United States,* 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 412 (1956); *Dynalectron Corp. v. United States,* 4 Cl. Ct. 424, 428 (1984), *aff'd,* 758 F.2d 665 (Fed.Cir.1984).

■ As the defendant correctly states, the plaintiff must establish by a preponderance of the evidence that AID acted in an arbitrary or capricious manner in terminating the contract negotiations. *See KECO Indus. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974); *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 783 (1991). *See also Isratex, Inc. v. United States,* 25 Cl.Ct. 223, 227 (1992); *Reel–O–Matic Sys., Inc. v. United States,* 16 Cl.Ct. 93, 99 (1989). The criteria for evaluating the reasonableness of the government's procurement decision include whether the government officials acted in bad faith, *KECO,* 203 Ct.Cl. at 574, 492 F.2d at 1203 (citing *Heyer Prods. Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409 (1956)); whether there was a complete lack of any reasonable basis for the procurement decision, *id.,* 203 Ct.Cl. at 574, 492 F.2d at 1204 (citing *Continental Business Enter. v. United States,* 196 Ct.Cl. 627, 452 F.2d

1016 (1971)); or whether there was a violation of statutes or regulations adopted for the protection of bidders. *Id.*[4]

■ The level of proof required of the plaintiff varies directly with the amount of discretion the government official could exercise. *Id.* In a negotiated procurement such as the instant case, the contracting officer has great discretion to negotiate what he believes to be the best contract for the government. *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983). Thus, plaintiff has a concomitantly heavier burden to establish abuse of that discretion. In effect, the court conducts an examination of the contracting officer's decision to determine if it had a rational basis. *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). The remedies for a breach of the implied-in-fact contract include recovery of bid-preparation costs, which is what HSMD seeks in this case. *KECO,* 203 Ct.Cl. at 574, 492 F.2d at 1203; *Dynalectron,* 4 Cl.Ct. at 428–29.

■ To be able to grant summary judgment for the government, the court, without weighing any of the competing evidence,[5] must be able to conclude that, as a matter of law, the plaintiff has not put forward any evidence to support its claim that the decision to terminate was arbitrary. Without addressing the weight it will ultimately give plaintiff's evidence, the court is persuaded that summary judgment is impossible, because plaintiff has put material issues of fact into dispute. In denying summary judgment, the court makes the following observations.

---

**4.** Plaintiff alleges that AID violated the Federal Acquisition Regulations ("FAR") by failing to make a formal request for a best and final offer from plaintiff. The government argues that the FAR does not apply in the context of sole-source procurements. While the FAR provisions may not be specifically applicable by their own terms, it cannot be the case that, in a sole source procurement, officials are free to act without restraint. The court agrees with the GAO that the FAR regulations provide a relevant point of comparison. For example, FAR 15.611 requires a contracting officer to issue a request for a best and final offer and put the bidder on notice that discussions are concluded. This notice is no less valuable to a sole-source contrac-

tor than it would be for a competitive bidder. Similarly, FAR 15.610(c)(2) requires a contracting officer to inform the bidder of deficiencies in its proposal so that it may make corrections. Again, this knowledge is as useful and necessary to meaningful negotiations in a sole-source acquisition as in a competitive bid.

**5.** In considering summary judgment, the evidence of the non-moving party is to be believed, and the court is to draw reasonable inferences in favor of it. The court cannot weigh competing evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 250, 106 S.Ct. 2505, 2510, 2511, 91 L.Ed.2d 202 (1986).

The parties have presented the court with a voluminous record. Defendant has proposed hundreds of findings of fact. Plaintiff agrees with very few of the more salient ones. The court has made a concerted effort to identify the findings that are minimally necessary to the government's motion and to critically assess the plaintiff's responses thereto. It has become apparent, however, that although much of what is contested could be eliminated as either unnecessary or not genuinely disputed, some issues will remain. In the final analysis, plaintiff will be able to draw from all the circumstances of the solicitation and negotiations to make its case. In this respect, although winning a bid protest is problematic, such a proceeding is directed to concepts more elastic than those that typically surface in a breach contest—bad faith, reasonableness, sufficient communications, etc. Defendant is put into the unfortunate position of responding to relatively subjective, wide-ranging accusations with isolated pieces of contradictory evidence. It is accordingly less appropriate for the court to preclude a comprehensive, simultaneous evaluation of the entire record, even if, as is the case here, defendant has many strong arguments.[6]

The court further notes that the GAO took live (albeit limited) testimony and made its decision on the record as a whole after weighing competing evidence. A casual reading of the opinion demonstrates the various resolutions of conflicting arguments that the Comptroller had to undertake. At this stage of these proceedings, the court does not have that option.

What follows are two illustrations of areas of dispute. The court would normally undertake a more comprehensive isolation of fact disputes. In this case that would be time consuming in the extreme, would largely duplicate work the parties should have done in connection with the motion, and would be of questionable durability.

Finally, the court notes that the circumstances, conversations and understandings surrounding the negotiations in Chad are central to the outcome. The impression is left from reading the record that the credibility of Dr. Barnes, Mr. Bennett, and others will be crucial.

### 1. Alleged failure to communicate with HSMD

■ Part of the duty to fairly and honestly consider bids is to give clear and accurate instructions as to problems or deficiencies. It is hardly fair to charge HSMD with being non-responsive if AID did not provide adequate information about what it expected and would accept. Plaintiff asserts that AID acted in bad faith by failing to inform it of deficiencies identified either by AID or by third parties in HSMD cost proposals. Defendant attempts to counter this assertion with evidence that it told Dr. Barnes on "numerous occasions" that the level of administrative backstopping was too high. This has not been established, however. HSMD wrote its initial cost proposal from the Project Paper ("PP") instead of the Statement of Work ("SOW"). The PP is a much more comprehensive document which goes far beyond what would be required by the TA contract. Dr. Barnes avers that because this was his first contract with AID, he did not know he was responding to the wrong document. AID states that it told Dr. Barnes several times that his proposal included items which were not part of the TA contract. However, the documents which allegedly support Dr. Barnes's knowledge are, variously, cables not distributed to Dr. Barnes, a letter to Dr. Barnes which does not refer to the level of backstopping, and Dr. Zoghby's personal notes taken during the Chad negotiations. There is no representation that Dr. Barnes knew the contents of Dr. Zoghby's handwritten notes.[7]

Dr. Barnes also asserts in an affidavit that he was never told specifically that his

---

**6.** One exception might relate to expenses incurred by HSMD in sending personnel to Chad or Washington, D.C., apparently at government invitation, with the expectation that those costs would be reimbursed.

**7.** There is no authentication that these are in fact the notes of Dr. Zoghby.

proposals allocated too much money for administrative backstopping. In order to conclude that Dr. Barnes knew the level of backstopping was unacceptable, the court would have to weigh the competing evidence presented. If we assume Dr. Barnes is telling the truth, and we draw the reasonable inference that Dr. Barnes did not receive copies of cables not addressed to him, his notice (or lack of notice) of AID's expectations would be an issue for trial.

Another circumstance allegedly demonstrating AID's bad faith was its contact with the Defense Contract Audit Agency ("DCAA"). The DCAA audit was necessary to the awarding of the contract to HSMD as a new section 8(a) contractor. Defendant alleges that the DCAA audit uncovered "fatal deficiencies" in HSMD's cost proposal, such as a failure to provide support for its cost rates. According to Dr. Barnes, however, he was never informed of the specifics of DCAA's concerns and thus never had a chance to make corrections. There is no evidence that AID did pass along the DCAA's questions. There is no letter from AID to HSMD requesting that it submit additional cost information. DCAA wrote directly to HSMD once, but that letter concerned only the issue of accounting procedures. AID argues that HSMD should have included this information in the first instance, but does not allege that it gave HSMD the chance to respond to the DCAA concerns.[8]

### 2. Did HSMD present a reasonable budget?

Also unresolved is when AID realized that it had underestimated the cost of the CCSP, and whether the amount AID later allocated was sufficient to do the work requested. The evidence only establishes, without contradiction, that AID conceded that its initial estimate of $4 million was inadequate. It later increased this amount to $11 million, which it now maintains was adequate.[9] HSMD disputes this, claiming that its bid of $13 million was not only reasonable, but was more realistic, because AID's original estimate was based on an assumption that the TA contract would be performed by so-called "personal service contractors" who typically have very low overhead costs. Plaintiff further defends its figure in the "Table of Assumptions and Justifications" attached to its bid proposals. It is possible that plaintiff's assumptions and justifications are assailable. The court does not, however, have before it uncontroverted evidence of how much the CCSP should be expected to cost. It would be unreasonable for AID to solicit responses to a proposal that it had no reasonable expectation of funding at required levels. At trial, the parties will have the opportunity to litigate whether AID's initial estimate of $4 million was reasonable, or, if it was not, whether the agency's subsequent allocation of $11 million cured the initial underestimate and reflected an adequate re-evaluation by AID of the costs involved.

### CONCLUSION

The motion for summary judgment is denied. The parties are directed to meet to discuss a proposed schedule to complete remaining discovery, if any. By October 19, 1992, they will file a status report proposing dates for further pretrial activities.

---

**8.** Defendant simultaneously argues that the DCAA audit is irrelevant because AID had decided long before the audit was concluded in January 1991 to terminate negotiations with HSMD.

**9.** Mildred Brown, an AID/Washington official concluded "It has now been clearly established

that the subject project was underbudgeted at the time the PP [Project Paper] was authorized by the Mission.... [T]he committee believes that the absence of cost estimates may have made it even more difficult to negotiate a contract."