**OMNIPLEX WORLD SERVICES CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 12–249 C.**

United States Court of Federal Claims.

Filed Under Seal: July 19, 2012.[1]

Filed with Redaction: Aug. 1, 2012.

1. This Opinion was filed under seal on July 19, 2012, Docket Number (Dkt. No.) 22. The court instructed the parties to file any requests for the redaction of protected material on or before Wednesday, August 1, 2012 at 12:00 noon Eastern Daylight Time. In response to the court's directive of July 19, 2012, both parties filed motions to redact. *See generally* Pl.'s Mot. for Redactions of Protected Material in the Court's Op., Dkt. No. 23; Def.'s Mot. to Redact Protected Material Contained in the Court's Sealed July 19, 2012 Op., Dkt. No. 24. The parties' motions to redact are GRANTED.

Timothy Sullivan, Washington, DC, for plaintiff. Katherine S. Nucci and Scott F. Lane, Washington, DC, of counsel.

Vincent de Paul Phillips, Trial Attorney, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director, Commercial Litigation

Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Jacqueline Posner, Senior Procurement Counsel, Office of the General Counsel, Office of Personnel Management, Washington, DC, of counsel.

## OPINION

HEWITT, Chief Judge.

This is a post-award bid protest brought by plaintiff Omniplex World Services Corp. (Omniplex or plaintiff), one of four incumbent contractors conducting fieldwork investigation for the United States Office of Personnel Management's (OPM) Federal Investigative Services (FIS). *See* AR 5 (Acquisition Plan); *cf. id.* at 6 (listing the four incumbent contractors); *accord* AR 6047–48 (Pricing Evaluation Mem.). FIS is responsible for conducting approximately 90% of the background investigations that are required for employment of the federal workforce. AR 3 (OPM Acquisition Strategy Mem.). Although FIS has in-house staff capable of performing these services, "the demand for background investigations exceeds the present [f]ederal capacity and is augmented by contractors." AR 5 (Acquisition Plan).

On February 18, 2011 OPM issued Solicitation Number OPM15–11–R–0003 (the Solicitation), Compl., Docket Number (Dkt. No.) 1, ¶ 5; *see* AR 121 (Solicitation), which sought proposals for the provision of "investigative fieldwork directly related to a federal background investigation," AR 130 (Solicitation). The Solicitation contemplated the award of multiple indefinite-delivery, indefinite-quantity contracts, AR 61 (Procurement Synopsis), and afforded OPM the discretion to divide the work among FIS in-house staff and as many contractors as it saw fit, *see* AR 122 (Solicitation). On October 21, 2011 OPM awarded contracts to three incumbent contractors: CACI Premier Technology, Inc. (CACI), KeyPoint Government Solutions, Inc. (KeyPoint) and U.S. Investigations Services, LLC (USIS). AR 6538 (Notice of Elimination Letter); *cf.* AR 6 (Acquisition Plan) (suggesting that Omniplex, CACI, KeyPoint and USIS are incumbent contractors); *accord* AR 6048 (Pricing Evaluation Mem.).

Plaintiff challenges OPM's decision to exclude Omniplex as an awardee. Compl. ¶ 1. Plaintiff makes three arguments in support of its protest: that OPM violated Federal Acquisition Regulation (FAR) 15.307(b) by failing to request final proposal revisions from all offerors within the competitive range; that OPM violated FAR 15.306(d)(3) by failing to engage in meaningful discussions with Omniplex; and that OPM's evaluation of Omniplex's technical proposal was unreasonable and inconsistent with the requirements of the Solicitation.[2] *Id.*

Before the court are plaintiff's Complaint, filed April 17, 2012; Plaintiff's Motion For Judgment On The Administrative Record (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 19, filed June 1, 2012; Defendant's Motion for Judgment on the Administrative Record and Response in Opposition to Plaintiff's Rule 52.1 Motion (defendant's Motion or Def.'s Mot.), Dkt. No. 20, filed June 15, 2012; and Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Judgment on the Administrative Record and Plaintiff's Response to Defendant's Cross–Motion for Judgment Upon the Administrative Record (plaintiff's Reply or Pl.'s Reply), Dkt. No. 21, filed June 22, 2012.

Defendant filed the Administrative Record (AR) on May 18, 2012. *See* Dkt. No. 17. The parties completed briefing on June 22, 2012, and the court held oral argument telephonically on Wednesday, June 27, 2012 at 11:00 a.m. Eastern Daylight Time.[3] *See* Order of May 1, 2012, Dkt. No. 15, at 2.

---

2. Defendant's Motion for Judgment on the Administrative Record and Response in Opposition to Plaintiff's Rule 52.1 Motion (defendant's Motion or Def.'s Mot.), Dkt. No. 20, includes a section that argues that the United States Office of Personnel Management (OPM) "properly evaluated the price proposals in this procurement." Def.'s Mot. 18 (capitalization omitted); *see id.* at 18–21. Because plaintiff does not challenge the reasonableness of OPM's pricing evaluations, *see*

Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for J. on the Admin. R. & Pl.'s Resp. to Def.'s Cross–Mot. for J. Upon the Admin. R., Dkt. No. 21, at 13 n. 3, the court will not address defendant's argument.

3. The oral argument held on Wednesday, June 27, 2012 was recorded by the court's Electronic Digital Recording (EDR) system. The times not-

For the reasons stated below, the court DENIES plaintiff's Motion and GRANTS defendant's Motion.

## I. Background [4]

### A. The Solicitation and Original Proposals

The Solicitation contemplated that awards would be made on a best-value basis: "Award will be made to the responsible [o]fferor whose proposal is most advantageous to the [g]overnment, technical merit, corporate capabilities, past performance, price, and other factor considered. Offerors that have submitted technically acceptable proposals will be evaluated for price reasonableness and completeness...." AR 221 (Solicitation). The Solicitation permitted the government to award the contract on the basis of offers received—without the need for discussions— and advised that "each initial offer should contain your best terms from a price and technical standpoint." *Id.* at 224; *accord id.* at 214 ("[Y]ou should submit your proposal on the most favorable terms possible from both a technical and pricing standpoint."). The Solicitation also provided that, following evaluation of the offerors' proposals, "a competitive range determination may be made." *Id.* at 223. The Solicitation stated that if oral presentations were necessary to identify the most qualified offerors, "only those [o]fferors within the competitive range will be scheduled for an oral presentation," and that, at the conclusion of the oral presentation, "clarifications and discussions may occur in accordance with FAR 15.306." *Id.* at 223–24.

The Solicitation required interested offerors to submit two volumes: one volume dedicated to each offeror's technical proposal, *id.* at 215–18, and one volume dedicated to each offeror's pricing proposal, *id.* at 218–20. The technical proposal was to include sections on each offeror's technical approach (or technical merit), corporate capabilities and past performance. *Id.* at 216. The Solicitation provided that, in its evaluation of the technical proposal, OPM would consider each offeror's technical merit to be more important than its corporate capabilities, which would be considered more important than its past performance. *Id.* at 221–22. OPM would consider eight factors in its evaluation of an offeror's technical merit: understanding of the work required; ability to address OPM's technical approach and comply with contractual terms; quality control plan; investigative materials and security plan; organization and management plan; implementation and start up plan; staffing and training plan; and key personnel. *Id.* at 222.

The pricing proposal was to include a schedule of prices and pricing details for certain Contract Line Item Numbers (CLINs). *Id.* at 218; *cf. id.* at 124–29 (listing CLINs). The Solicitation provided that OPM would employ price analysis to evaluate the reasonableness of each offeror's price as well as each offeror's "understanding of the work and ... ability to perform the contract." *Id.* at 223. OPM would consider each offeror's pricing proposal to be subordinate to each offeror's technical proposal. *Id.*

Proposals to the Solicitation were originally due April 18, 2011, *see* AR 6717 (Apr. 8, 2011 e-mail from Andrea Dell'Omo to James Thieme), but this date was extended to May 9, 2011, AR 260 (Third Amendment [5]); *see*

---

ed in citations to the oral argument refer to the EDR record of the oral argument.

4. The facts are taken from plaintiff's Complaint (Compl.), Dkt. No. 1; the Administrative Record (AR), *see* Dkt. No. 17; and defendant's Motion. Unless otherwise noted, the facts do not appear to be in dispute.

The court cites to several e-mails that are included in the AR. *See* Part I.A–B; *infra* nn. 5, 7 & 14. The parties to these e-mails include: James Thieme, the OPM contracting officer assigned to Solicitation Number OPM15–11–R–0003 (the Solicitation), AR 116 (Solicitation); Clint Hartle,

the OPM contracting specialist assigned to the Solicitation, AR 6003 (Competitive Range Determination Mem.); Lisa McLeod, the contract manager at Omniplex World Services Corp. (Omniplex), AR 952 (July 15, 2011 letter); *cf. infra* n. 7 (noting an error in the address of the July 15, 2011 letter); and Andrea Dell'Omo, the contract manager at CACI Premier Technology, Inc. (CACI), AR 6717 (Apr. 8, 2011 e-mail from Andrea Dell'Omo to James Thieme).

5. The Solicitation was amended six times. *See* AR 972 (July 19, 2011 letter) (listing the effective dates of each amendment). The first amendment changed the requirements of the pre-proposal

*also* AR 6003 (Competitive Range Determination Mem.). Seven offerors submitted proposals in response to the Solicitation, AR 5894 (Initial Technical Evaluation Mem.), three of which were eliminated from the consideration on the basis of their technical proposals, *see id.* at 5906, 5909, 5918; AR 6007 (Competitive Range Determination Mem.). The technical proposals of the four remaining offerors—CACI, KeyPoint, Omniplex and USIS (the four offerors), AR 5895 (Initial Technical Evaluation Mem.)—were considered "conditionally acceptable as submitted" with low or moderate risk for award after "clarifications and modifications," *id.* at 5895, 5898, 5902, 5914. The four offerors were viewed as being within the competitive range, AR 6007 (Competitive Range Determination Mem.).

The pricing proposals submitted by the four offerors ranged from 26% to 42% over the budget approved by OPM's Capital Investment Committee (CIC),[6] AR 6007 (Competitive Range Determination Mem.); *see* AR 6889 (June 2, 2011 e-mail from Clint Hartle to James Thieme) ("All acceptable vendors are at least [* * *] than the CIC approval."), and FIS determined that it "could not absorb" the prices proposed, AR 6066 (Pricing Evaluation Mem.); *see also* AR 6031 (Competitive Range Determination Mem.) (stating that FIS "has indicated that they cannot in

any way accept the pricing which has been proposed by the [four offerors]"). OPM therefore chose to postpone its evaluation of the pricing proposals until FIS "rework[ed] the incentive, disincentive, and tolerance ranges" of the Solicitation. AR 6031 (Competitive Range Determination Mem.); *see also* AR 6046 (Pricing Evaluation Mem.) (stating that FIS had "retool[ed] its performance evaluation (quality/timeliness) disincentives" in an effort to lower pricing). OPM also intended to seek "proposal revisions from [the four offerors], in order to clarify/revise sections of the proposal which may have been unclear, obtuse, insufficient, or inadequate." AR 6007 (Competitive Range Determination Mem.).

**B. The Revised Solicitation and Revised Proposals**

On July 8, 2011 OPM sent each of the four offerors an e-mail requesting a "proposal revision." *See* AR 341, 455, 569, 683 (July 8, 2011 e-mails from OPM to Omniplex, CACI, USIS and KeyPoint). Attached to each e-mail was a letter (July 8, 2011 letter), a series of questions tailored to each offeror, a copy of the revised Solicitation, a summary of the revisions to the Solicitation, a revised wage determination and a revised pricing workbook. *See* AR 342,[7] 457, 570, 684 (July 8,

---

conference. AR 258 (First Amendment); *see also* AR 6003 (Competitive Range Determination Mem.). The second amendment extended the due date for proposals to May 2, 2011. AR 259 (Second Amendment); *see also* AR 6003 (Competitive Range Determination Mem.). The third amendment added questions and answers to the posting, offered a revised pricing workbook and extended the due date for proposals to May 9, 2011. AR 260 (Third Amendment), *see also* AR 6003 (Competitive Range Determination Mem.). The fourth amendment encompassed various substantive changes and is discussed *infra* in Part I.B. *See* AR 342 (July 8, 2011 letter); *infra* Part I.B. The fifth amendment extended the due date for proposal revisions. *See* AR 951 (e-mail from Clint Hartle to Lisa McLeod); AR 955 (July 15, 2011 letter); *infra* Part I.B (discussing OPM's request for proposal revisions). The sixth amendment extended the estimated start date of the contract from July 5, 2011 to October 1, 2011, *see* AR 973 (July 19, 2011 letter); AR 6999 (July 18 & 19, 2011 e-mails between Andrea Dell'Omo and Clint Hartle), in addition to making various other changes that are not relevant to this case, AR 971–1071 (Sixth Amendment).

6. Prior to issuing the Solicitation, OPM developed an acquisition plan that discussed various considerations associated with the proposed acquisition. AR 5 (Acquisition Plan). One such consideration was the budget for this acquisition, which was determined by utilizing "independent government cost estimate[s]" for each Contract Line Item Number. *Id.* at 6. The estimated annual budget, which was approved by OPM's Capital Investment Committee (CIC), was $445 million to $540 million—or $2.456 billion over a five-year period. *Id.*

7. Both the July 8, 2011 letter and the July 15, 2011 letter (the letters) to Omniplex were addressed to "OMNISEC International Investigations, Inc." *See* AR 342 (July 8, 2011 letter); AR 952 (July 15, 2011 letter). Given that the court does not observe any other references to "OMNISEC International Investigations, Inc." in the Administrative Record and that Ms. McLeod acknowledges that "OMNIPLEX" had received the July 15, 2011 letter, *see* AR 950 (July 15, 2011 e-mail from Ms. McLeod to Clint Hartle), the court understands that OPM erred in addressing the letters to "OMNISEC" instead of to "OMNIPLEX."

2011 letters to Omniplex, CACI, USIS and KeyPoint). With the exception of the address and salutation, each offeror received the same letter. *See id.* Both the e-mails and the letters were addressed to each individual offeror; none of the other offerors was copied on either the July 8, 2011 e-mail or the attached July 8, 2011 letter. *See* AR 341–42, 456–57, 569–70, 683–84 (July 8, 2011 e-mails and letters from OPM to Omniplex, CACI, USIS and KeyPoint).

The July 8, 2011 letter notified each offeror "that several changes have been made to the solicitation," and that OPM believed that these changes would *"significantly* lower the overall price of the proposal." AR 342 (July 8, 2011 letter).[8] The July 8, 2011 letter also requested that each offeror review any earlier clarifications and incorporate them "into a formal proposal revision," which was to be due "no later than *3:00 PM on July 21, 2011." Id.; see also id.* ("Your company's responses will serve as a proposal revision...."). OPM later extended the due date for "proposal revisions to 2:30 PM Monday July 25, 2011." AR 955 (July 15, 2011 letter); *see* AR 951 (e-mail from Clint Hartle to Lisa McLeod).

Omniplex submitted several questions to OPM regarding the revised Solicitation and the July 8, 2011 letter, to which OPM responded in a letter dated July 15, 2011 (July 15, 2011 letter). *See* AR 952–55 (July 15, 2011 letter). The July 15, 2011 letter included the following exchanges about pricing:

*Question 4.* If we do have price changes, does OPM require that we submit the same full detail as our original submission, or does OPM only require that we submit the revised pricing template included within OPM's [July 8, 2011 letter]?

*Answer 4:* Contractors should submit entire revised pricing proposals. Because significant changes have been made to the solicitation, including changes to the underlying wage determination, we would expect to see revised pricing proposals in their entirety....

. . .

*Question 7.* We did not see any specific questions/clarifications on our May 9, 2011 Pricing Proposal volume submittal within OPM's [July 8, 2011 letter]. Are we correct that OPM does not have specific pricing questions/clarifications for OMNIPLEX to address?

*Answer 7:* Due to the numerous changes to the solicitation it is our opinion that the pricing proposal will be significantly changed and resubmitted in its entirety. Pending a pricing evaluation of the proposed revision, other questions may arise which we will ask you to address at a later date.

*Question 8.* We have noted that OPM has made changes to the [Solicitation].... However, the underlying scope/coverage/reporting requirements of all CLIN products remain unchanged. Further, the [July 8, 2011 letter] did not identify specific questions/clarifications within [sic] respect to OMNIPLEX's original pricing submission of May 9th.

Taking these items into consideration, we remain unsure of the correlations that would result in *significantly lower* pricing, as stated in OPM's [July 8, 2011 letter]. So that we can thoroughly review our proposal pricing, and present fully competitive pricing to OPM, we respectfully request further guidance from OPM as to the process and interpretation—and also the range estimates—to allow OMNIPLEX to consider the *significantly lower* pricing in any revised price volume submission.

*Answer 8:* The majority of Section F: Deliveries or Performance, has been changed. Contractors should carefully examine the revisions to the solicitation, especially the changes to Section F, and provide a revised pricing proposal (as appropriate) in accordance with response to Question 4.

*Id.* at 954–55.

The four offerors timely submitted their proposal revisions by July 25, 2011.[9] *See* AR

---

8. Because each of the July 8, 2011 letters sent to the four offerors is substantively identical, the court cites to the letter received by Omniplex when citing to the July 8, 2011 letter. *See* AR 342 (July 8, 2011 letter).

9. On August 15, 2011 Omniplex submitted an update to its training plan (August 15, 2011 Sub-

1866–2249 (Revised Omniplex Proposal), 2807–3253 (Revised CACI Proposal), 3800–4357 (Revised USIS Proposal), AR 4865–5402 (Revised KeyPoint Proposal). OPM's technical evaluation team met on July 26–27, 2011 and again on August 19, 2011 to evaluate the revised technical proposals. AR 5922 (Final Technical Evaluation Mem.); AR 5952 (Addendum to Final Technical Evaluation Mem.). OPM's technical team rated the revised technical proposals of USIS, CACI and KeyPoint as "acceptable as is with a low risk for award" and the revised technical proposal Omniplex as "conditionally acceptable as submitted with a moderate risk for award." AR 5952–53 (Addendum to Final Technical Evaluation Mem.); see AR 5944 (Final Technical Evaluation Mem.) (providing USIS's rating). OPM's technical evaluation team highlighted several concerns in Omniplex's proposed training program, including the [* * *]. AR 5953 (Addendum to Final Technical Evaluation Mem.).

With respect to the offerors' revised pricing proposals, OPM found the proposals of USIS, KeyPoint and CACI to be materially acceptable. AR 6047 (Pricing Evaluation Mem.); see id. at 6059 (stating that the prices of these three offeror were "within a reasonable range of the average CLIN price"). All three of these offerors lowered their pricing in response to the July 8, 2011 letter: USIS lowered its pricing by $385 million,[10] CACI lowered its pricing by $83 million and KeyPoint lowered its pricing by $34.4 million. Id. at 6049.

Only Omniplex increased its pricing—by $571 million. Id. In the cover letter to its revised proposal, Omniplex stated that the changes made to the Solicitation had not provided Omniplex with an opportunity "to significantly lower its prices." AR 2038 (Omniplex's Revised Proposal). Omniplex's ex-

planation for its increased prices included the following: "[W]hen we consider the revisions to the contract term that further extend the potential support periods, the increased escalation for those periods actually results in slightly higher prices, as it [* * *]." Id. Omniplex noted that it is [* * *]. Id.

OPM found Omniplex's revised pricing proposal to be unacceptable. AR 6047 (Pricing Evaluation Mem.). OPM found that the pricing proposed by Omniplex was "across the board very high and outside of the reasonable range." Id. at 6058. More specifically, OPM found that Omniplex's proposed prices were "materially outside of what [OPM] would consider reasonable on nearly every CLIN." Id. at 6048. Given that Omniplex had "effectively priced [itself] out of the market," OPM recommended not "seeking a best and final proposal or award" from Omniplex. Id.

On October 21, 2011 OPM notified Omniplex that its "proposed pricing was determined to be non-competitive," AR 6539 (Notice of Elimination Letter), and that Omniplex would not be awarded a contract associated with the Solicitation, id. at 6538. The letter indicated that Omniplex's proposed pricing was approximately 17% higher than that of the next highest bidder and was "significantly more expensive than the prices that OPM charges its customers on nearly every case type." Id. at 6539; see AR 6047 (Pricing Evaluation Mem.) (stating that Omniplex's proposed pricing was $528 million higher than that of the next highest bidder's). The letter further stated, "In our negotiation letter OPM specifically requested that OMNIPLEX reduce its pricing. Instead of offering a price reduction OMNIPLEX substantially raised its prices in the proposal revision." AR 6539 (Notice of Elimination Letter).

---

mission). Compl. ¶ 18; accord AR 5952 (Addendum to Final Technical Evaluation Mem.). OPM's technical evaluation team reviewed Omniplex's August 15, 2011 Submission, but determined that it did affect Omniplex's overall technical rating. AR 5952 (Addendum to Final Technical Evaluation Mem.).

10. According to plaintiff, the comparatively larger price reduction by U.S. Investigations Services, LLC (USIS) is due to the fact that USIS

used an incorrect pricing workbook in its original pricing proposal. See Pl.'s Mot. for J. on the Admin. R., Dkt. No. 19, at 34, n. 5. Plaintiff claims that when taking this error into account, USIS's prices in its revised pricing proposal would have decreased by approximately $138 million. See id. Defendant does not dispute this contention, see Def.'s Mot. passim, and the court does not find that the extent of USIS's reduction in price affects the outcome of the case.

## C. Procedural History

On October 31, 2011 OPM conducted a debriefing with Omniplex, and Omniplex filed an agency protest a few days later. AR 7588 (OPM Protest); Def.'s Mot. 6. OPM denied Omniplex's protest, AR 7612–21 (OPM Decision), and Omniplex filed a protest with the Government Accountability Office (GAO) on December 15, 2011, AR 7094 (GAO Protest). Omniplex presented to GAO the same three arguments that plaintiff presents here: that OPM had violated FAR 15.307(b) by not requesting FPRs from the four offerors in the competitive range; that OPM had violated FAR 15.306(d)(3) by not engaging in meaningful discussions with Omniplex; and that OPM's evaluation of Omniplex's technical proposal was unreasonable and inconsistent with the requirements of the Solicitation. *Id.* at 7095.

GAO denied the protest on March 14, 2012. AR 7128 (GAO Decision). GAO found that, because OPM had provided all four offerors with a common cut-off date to submit proposal revisions, *id.* at 7133, Omniplex was on notice to provide its best and final offer, *id.* at 7132. GAO also found that OPM was under no duty to conduct discussions after it had amended the Solicitation and informed all four offerors that it "was expecting entirely revised pricing proposals with significantly lower prices." *Id.* at 7134 (internal quotation marks and brackets omitted). After concluding that OPM had acted properly by not awarding a contract to Omniplex, GAO declined to address Omniplex's third argument. *Id.*

## II. Legal Standards

### A. Jurisdiction

■ The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b)(1) (2006), affords the United States Court of Federal Claims (Court of Federal Claims) jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement[,] ... [regardless of] whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). A plaintiff therefore does not have standing to bring a protest action in this court unless it is an "interested party." *See id.*; *GTA Containers, Inc. v. United States,* 103 Fed.Cl. 471, 479 (2012). Because "standing is a jurisdictional requirement, a protestor's failure to establish standing precludes a ruling on the merits." *Sci. Applications Int'l Corp. v. United States,* 102 Fed.Cl. 644, 650 (2012) (internal quotation marks omitted); *see also Labatt Food Serv., Inc. v. United States (Labatt Food),* 577 F.3d 1375, 1378 (Fed.Cir.2009) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." (internal quotation marks omitted)).

■ To show that it is an "interested party" within the context of § 1491(b)(1), a plaintiff must "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.Cir.2006); *see also Am. Fed'n of Gov. Emps. Local 1482 v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (defining an "interested party" as an "actual or prospective bidder[ ] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). To establish that a plaintiff's "direct economic interest" is affected in the post-award bid protest context, a plaintiff "must show it would have been 'a qualified bidder,' i.e., that it had a 'substantial chance' of being awarded the contract." *Microdyne Outsourcing, Inc. v. United States,* 72 Fed.Cl. 230, 232 (2006) (quoting *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370–71 (Fed. Cir.2002)); *see also Brooks Range Contract Servs., Inc. v. United States (Brooks Range),* 101 Fed.Cl. 699, 713 (2011) ("A finding of standing in a post-award bid-protest case requires that the protestor have a 'substantial chance' to obtain the cont[r]act if the alleged errors are found to exist."). Stated differently, a plaintiff must show that it has

been prejudiced by the alleged error in the government procurement process—that "but for the error, it would have had a substantial chance of securing the contract." *Labatt Food,* 577 F.3d at 1378; *see also Brooks Range,* 101 Fed.Cl. at 706 ("[A] protestor must demonstrate how an alleged error by the government would result in 'particularized harm' to the protestor.").

■ Omniplex is an actual bidder and therefore meets the first prong of the interested party test. *Cf. Orion Tech., Inc. v. United States,* 102 Fed.Cl. 218, 226 (2011); *Chenega Mgmt., LLC v. United States,* 96 Fed.Cl. 556, 571 (2010). With respect to the second prong of this test, Omniplex was an incumbent contractor providing the services requested by the Solicitation, *see* AR 6048 (Pricing Evaluation Mem.), and was included in the competitive range of offerors, AR 6032 (Financial Condition Evaluation Mem.). If the court were to find in plaintiff's favor and OPM were obligated to reopen the procurement, *see* Compl. 15 (requesting, inter alia, "declaratory relief requiring OPM to re-open the procurement), the court finds that Omniplex would have a substantial chance of receiving an award, *cf. Esterhill Boat Serv. Corp. v. United States,* 91 Fed.Cl. 483, 486 (2010) ("If the allegations are correct and the Government were obligated to rebid the contracts, plaintiff could win with resubmitted proposals."). In other words, but for OPM's alleged failure to request FPRs, alleged failure to engage in meaningful discussions with the offerors in the competitive range and alleged unreasonable evaluation of Omniplex's technical proposal, Omniplex would have had a substantial chance of receiving an award. *Cf. Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa),* 238 F.3d 1324, 1334 (Fed.Cir.2001) (finding that the appellant had standing where, assuming appellant's protest was successful, the appellant had a substantial chance of being awarded the government's re-solicitation of the contract).

The court finds that Omniplex is an actual bidder and possesses a direct economic interest in the award of the Solicitation. *See Rex Serv. Corp.,* 448 F.3d at 1307. The court is satisfied that Omniplex is an interested party within the context of 28 U.S.C. § 1491(b)(1) and therefore has standing to bring this bid protest action.

### B. Motion for Judgment on the Administrative Record

■ Motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). *See* RCFC 52.1(c). "A motion for judgment upon the administrative record is distinguishable from a motion for summary judgment." *Mission Critical Solutions v. United States,* 91 Fed.Cl. 386, 394 (2010) (citing *Bannum, Inc. v. United States,* 404 F.3d 1346, 1355 (Fed.Cir.2005); RCFC 52.1 Rules Committee Note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record.")). When evaluating cross-motions for judgment on the administrative record, the court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *DMS All–Star Joint Venture v. United States,* 90 Fed.Cl. 653, 661 (2010) (citing *Bannum,* 404 F.3d at 1356–57). "The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding." *CRAssocs., Inc. v. United States,* 102 Fed.Cl. 698, 710 (2011) (citing, inter alia, *Bannum,* 404 F.3d at 1356).

"The standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases." RCFC 52.1 Rules Committee Note (2006). Here, the standards of review and burdens of proof and persuasion are set by the Administrative Procedure Act (APA) as interpreted and applied in binding precedent. *See* 28 U.S.C. § 1491(b)(4); *infra* Part II.C.

### C. Standard of Review

■ The court reviews a bid protest action under the standards set forth in the APA at 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004). The APA pro-

vides that an agency's decision shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.2004). In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa,* 238 F.3d at 1332. "[T]his standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" *CRAssocs.,* 102 Fed.Cl. at 710 (second brackets in original) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

■ When a plaintiff challenges a procurement based upon a procurement official's irrational decision, the court must determine whether the procuring agency "provided a coherent and reasonable explanation of its exercise of discretion." *Impresa,* 238 F.3d at 1332–33 (internal quotation marks omitted). This entails an examination of whether the procuring agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or reached a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed.Cir.2009) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). When challenging an agency's technical determination, a plaintiff bears "an unusually heavy burden of proof in showing that the determination made in this regard

was arbitrary and capricious." *Cont'l Bus. Enters., Inc. v. United States,* 196 Ct.Cl. 627, 637, 452 F.2d 1016, 1021 (1971). "The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Beta Analytics Int'l, Inc. v. United States (Beta Analytics),* 67 Fed.Cl. 384, 395 (2005).

■ When a plaintiff challenges a procurement based upon violations of statutes or regulations, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa,* 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir. 1973)); *cf. Brooks Range,* 101 Fed.Cl. at 707 ("In order to prevail in a bid protest, the plaintiff must demonstrate both that an error occurred and that the error was prejudicial."). "In pre-award protests, the protester can establish prejudice by showing 'a nontrivial competitive injury which can be redressed by judicial relief.'" *DGR Assocs., Inc. v. United States,* 94 Fed.Cl. 189, 199 (2010) (quoting *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1361 (Fed.Cir.2009)). In post-award bid protests, however, a protester "must show that there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum,* 404 F.3d at 1353 (citing *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003); *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999)).

III. Discussion

 A. Plaintiff Has Not Established a Clear and Prejudicial Violation of FAR 15.307(b)

 1. Plaintiff Has Established that OPM Violated FAR 15.307(b)

■ Plaintiff argues that OPM violated FAR 15.307(b) by failing to request FPRs from the four offerors in the competitive range. Pl.'s Mot. 24. Defendant contends that the July 8, 2011 letter "complied with

the spirit and ... the letter of [FAR 15.307(b) ]." Oral Argument of June 27, 2012, Argument of Mr. Vincent de Paul Phillips at 11:44:56–45:05. For the reasons stated below, the court finds that OPM violated FAR 15.307(b) by failing properly to establish a common cut-off date for the receipt of FPRs and by failing to convey that it "intend[ed] to make award without obtaining further revisions." *See* FAR 15.307(b).

FAR 15.307(b) states in its entirety:

The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations. At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision. The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions. Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions.

*Id.* FAR 15.306(d) explains the distinction between negotiations and discussions: "Negotiations are exchanges, ... between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal.... When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions." FAR 15.306(d). Neither party disputes that OPM engaged in discussions with the four offerors in the competitive range. *See* Pl.'s Mot. 26 (stating that OPM "chose to engage in discussions when it established a competitive range" and sent to the four offerors the July 8, 2011 letters); Def.'s Mot. 13 (stating that OPM "had engaged in complete discussions with each offeror"). Plaintiff argues, however, that OPM failed to properly conclude these discussions with a request for FPRs. *See* Pl.'s Mot. 26.

Plaintiff acknowledges that FAR 15.307(b) may not specifically require that the agency use the exact words " 'final proposal revision,' " Pl.'s Reply 8, but argues that "[t]he clearest and simplest method for agencies to comply with the fundamental mandates of

FAR 15.307(b) is to specifically request 'final' proposal revisions by a common cut-off date at the conclusion of discussions," *id.* at 3 (citing Vernon J. Edwards, *Meaningful Discussions: The Unending Quest for Clarity and Sound Policy,* 22 Nash & Cibinic Rep. ¶ 57 (2008)). Plaintiff contends that, at the very least, FAR 15.307(b) requires requests for FPRs "to reasonably convey that discussions are closed and that all offerors remaining in the competitive range are being given a final opportunity to revise their proposals." *Id.* at 8; *see id.* at 5 ("[T]he agency must at a minimum reasonably inform offerors that discussions are completed." (citing, inter alia, *Dubinsky v. United States,* 43 Fed.Cl. 243, 263 (1999))).

Plaintiff claims that both the July 8, 2011 letter and the July 15, 2011 letter implied that OPM planned to continue discussions with the offerors. *See* Pl.'s Mot. 26; Pl.'s Reply 5. Plaintiff contends that the following language in the July 8, 2011 letter suggests that OPM had not concluded discussions, *see* Pl.'s Reply 5: "OPM's preliminary evaluation of technical and cost proposals is now complete," and "Following evaluation of your company's responses, OPM will determine whether face to face negotiations are necessary," AR 342–43 (July 8, 2011 letter). Plaintiff also claims that Omniplex did not realize that the other offerors had also received the July 8, 2011 letter. Pl.'s Reply 6. Because the letter it received was addressed solely to Omniplex and referred to the addressee as " '[y]our company,' " *id.* (quoting July 8, 2011 letter), Omniplex was "unaware that a 'common' cut-off date had been established," *id.; see* Oral Argument of June 27, 2012, Argument of Mr. Timothy Sullivan at 11:18:18–29; *cf.* FAR 15.307(b) ("The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions.").

In the July 15, 2011 letter, plaintiff points to OPM's assertion that it planned "to have this contract in place by October 1, 2011," AR 954 (July 15, 2011 letter), which, according to plaintiff, left the offerors "ample time for final proposal revisions," Pl.'s Mot. 27; *see also* Pl.'s Reply 5 (stating that this left "over two months for final proposal revi-

sions"); Oral Argument of June 27, 2012, Argument of Mr. Timothy Sullivan at 11:25:59–26:03 ("There was certainly no sense of urgency or finality expressed by OPM in [the July 15, 2011 letter]."). As with the July 8, 2011 letter, plaintiff contends that the following language in the July 15, 2011 letter suggests that OPM had not concluded discussions, *see* Pl.'s Mot. 26: "Pending a pricing evaluation of the proposed revision, other questions may arise which we will ask you to address at a later date," AR 955 (July 15, 2011 letter). Finally, plaintiff notes that both letters "refer[ ] to the pending submission as a 'proposal revision.'" Pl.'s Reply 5; *cf.* Oral Argument of June 27, 2012, Argument of Mr. Timothy Sullivan at 11:20:40–45 (arguing that "formal" proposal revision, which was used in the July 8, 2011 letter, is not equivalent to a "final" proposal revision).

Defendant argues that the July 8, 2011 letter served as a request for FPRs. Def.'s Mot. 14; *see id.* at 15 ("The finality of the letter each offeror received is plainly evident."). Defendant points to the request in the July 8, 2011 letter that each offeror submit "formal proposal [revisions];"[11] its notification that each offeror's response will "serve as a proposal revision, becoming part of any subsequent contract;" and its instruction that each offeror must submit its proposal revision "no later than *3:00 PM on July 21, 2011.*" *Id.* at 14 (internal quotation marks omitted); *accord* AR 342 (July 8, 2011 letter). According to defendant, the July 8,

2011 letter "meant that the discussions were concluded and the [g]overnment was allowing, and expected, each offeror to revise their proposals by a fixed cut-off date." Def.'s Mot. 14 (citing, inter alia, *Cleveland Telecomms. Corp. v. Goldin (Cleveland)*, 43 F.3d 655, 658 (Fed.Cir.1994)). Defendant argues that "language giving notice to all offerors of a common cut-off date for receipt of proposal revisions has the intent and effect of a request for a 'final' proposal revision." *Id.*

Two cases are particularly relevant to the parties' arguments: *Cleveland*, 43 F.3d 655, which is cited by defendant, *see* Def.'s Mot. 13–14, and *Dubinsky*, 43 Fed.Cl. 243, which is relied upon by plaintiff, *see* Pl.'s Mot. 24–25. Both cases turn on the respective court's characterization of letters sent by the procuring agency—the National Aeronautics and Space Administration (NASA) in *Cleveland* and the United States Air Force (USAF) in *Dubinsky*—to offerors in the competitive range. *See Cleveland*, 43 F.3d at 656–57; *Dubinsky*, 43 Fed.Cl. at 244.

In *Cleveland*, the United States Court of Appeals for the Federal Circuit (Federal Circuit) found that the letters sent by NASA to the offerors (NASA letters) did qualify as requests for best and final offers (BAFOs).[12] *Cleveland*, 43 F.3d at 658–59. The NASA letters explained that NASA was reopening discussions and that the offerors could amend their previously submitted BAFOs. *Id.* at 657. The NASA letters stated in full:

**11.** Defendant's Motion states that the July 8, 2011 letter asked the offerors to "submit formal proposal requests." Def.'s Mot. 14 (internal quotation marks omitted). The court understands that defendant intended to quote the July 8, 2011 letter, which requests offerors to submit a "formal proposal revision." AR 342 (July 8, 2011 letter); *cf.* Oral Argument of June 27, 2012, Argument of Mr. Vincent de Paul Phillips at 11:47:16–18 (pointing to the July 8, 2011 letter's request for a "formal proposal revision").

**12.** "Best and final offers" is the terminology used in FAR 15.611 (1992), the predecessor to FAR 15.307(b). *See ABF Freight Sys., Inc. v. United States*, 55 Fed.Cl. 392, 402 (2003) ("The FAR provision governing final proposal revisions prior to the FAR Part 15 rewrite was FAR § 15.611."); *Spectrum Sci. & Software, Inc.*, B–282373, 99–1 CPD ¶ 114, 1999 WL 427408, at *2 (Comp.Gen. June 22, 1999) (recognizing that

FAR 15.611 was the predecessor to FAR 15.307(b)). FAR 15.611, titled "Best and final offers," stated in relevant part:

(a) Upon completion of discussions, the contracting officer shall issue to all offerors still within the competitive range a request for best and final offers. Oral requests for best and final offers shall be confirmed in writing.
(b) The request shall include—
(1) Notice that discussions are concluded;
(2) Notice that this is the opportunity to submit a best and final offer;
(3) A common cutoff date and time that allows a reasonable opportunity for submission of written best and final offers; and
(4) Notice that if any modification is submitted, it must be received by the date and time specified and is subject to the Late Submissions, Modifications, and Withdrawals of Proposals provision of the solicitation (*see* 15.412).
FAR 15.611(a)-(b).

Based on the responses received from some offerors to the questions sent out by the Government during oral and written discussions, the Government has determined a need to conduct a second round of discussions. Therefore, while the Government has no further questions or need for clarification concerning your referenced proposal, you are hereby given the opportunity to submit any amendments you may have to your referenced proposal. The final cut-off for receipt of any amendments is 4:30 p.m., local time, August 25, 1993.

*Id.* The plaintiff in *Cleveland* argued that the NASA letters did not comply with the governing regulation, FAR 15.611, *see supra* n. 12, because they failed to state that discussions were complete and failed to state explicitly that this was the opportunity to submit best and final offers, *Cleveland,* 43 F.3d at 657.

The Federal Circuit did not find either of plaintiff's arguments to be meritorious. *Id.* at 658. With respect to the plaintiff's first argument, concerning the completion of discussions, the Federal Circuit found that the statement "the government has no further questions or need for clarification concerning your referenced proposal" sufficiently conveyed that discussions were complete. *Id.* at 659; *see also id.* at 658 (finding that, when "properly construed and interpreted," the NASA letters indicate that discussions were complete). With respect to the plaintiff's second argument, concerning the failure to inform offerors of the opportunity to submit BAFOs, the Federal Circuit observed that FAR 15.611 does not require that an agency use the words "best," "final" or "offer" when making a request for BAFOs. *Id.* at 658. Citing the statement "you are hereby given the opportunity to submit any amendments you may have to your referenced proposal," the Federal Circuit found that the NASA letters sufficiently conveyed that this was the offerors' opportunity to submit BAFOs. *Id.*

The Federal Circuit also stated that "the regulations do not require a notice to offerors requesting BAFOs to expressly state that it is a request for BAFOs," *id.,* and found that the August 25, 1993 cut-off date in the NASA letters "indicat[ed] that the opportunity to submit amendments to the original BAFO amounted to a request for a second BAFO and as a notice when it must be filed," *id.* at 658–59.

In *Dubinsky,* the Court of Federal Claims found that the letters sent by the USAF (USAF letters) did not qualify as requests for final proposal revisions. *Dubinsky,* 43 Fed.Cl. at 263 (citing, inter alia, FAR 15.307(b)). The USAF Letters detailed the deficiencies in the offerors' original proposals and requested that the offerors submit "amended proposals by 3:00 p.m. Mountain Standard Time on September 25[, 1998]." *Id.* at 249. The Court of Federal Claims identified four criteria for determining whether an agency's communication qualifies as a request for an FPR, finding that "[a] request for final proposal revisions must: (1) inform offerors that discussions have been completed; (2) state that offerors are being given a final opportunity to revise their offers; (3) establish a common cut-off date; and (4) require offerors to submit their offers in writing." *Id.* at 263. The Court of Federal Claims determined that the USAF letters did not meet the first two criteria, *id.,* which, according to the court, distinguished them from the NASA letters before the Federal Circuit in *Cleveland, see id.* at 263 n. 49 (noting that the letters in *Cleveland* informed offerors that "the deadline for receipt of amended proposals was the 'final cut-off for receipt of any amendments'" and "that 'the Government has no further questions or need for clarification' concerning its proposal"). The Court of Federal Claims therefore found that the USAF letters did not qualify as requests FPRs under FAR 15.307(b).[13] *Id.* at 263.

---

**13.** This did not end the court's inquiry, however. The court observed that the United States Air Force (USAF) continued to accept proposal revisions from one of the offerors (the awardee) after the final cut-off date of September 25, 1998. *Dubinsky v. United States,* 43 Fed.Cl. 243, 251–52, 263 (1999). The *Dubinsky* court observed

that "once the request for final proposal revisions [(FPRs)] has been issued at the conclusion of discussions, it follows that an agency generally may not engage in further discussions with any offerors." *Id.* at 261. The court held that the failure of USAF to give the remaining offerors within the competitive range an opportunity to

The court finds that, like the USAF letters in *Dubinsky,* the July 8, 2011 letter failed sufficiently to convey that OPM "intend[ed] to make award without obtaining further revisions." *See* FAR 15.307(b). The court does not find the request in the July 8, 2011 letter for a "formal proposal revision," AR 342 (July 8, 2011 letter), to be evidence to the contrary. Nor does the court consider the request in the July 8, 2011 letter for responses to be submitted "no later than 3:00 PM on July 21, 2011," *id.* (emphasis omitted), to be determinative of the matter. FAR 15.307(b) requires that requests for FPRs include, among other things, a "common cut-off date." FAR 15.307(b); *accord Cleveland,* 43 F.3d at 658 (recognizing that "language giving notice to all offerors of a common cut-off date for receipt of offers has the intent and effect of a request for BAFOs" (internal quotation marks omitted)). Given that none of the other offerors in the competitive range was indicated as a recipient of the July 8, 2011 letter to Omniplex, the court finds reasonable Omniplex's belief that the July 21, 2011 deadline were not, in fact, a "common" cut-off date. *See* Pl.'s Reply 6; Oral Argument of June 27, 2012, Argument of Mr. Timothy Sullivan at 11:18:18–29; *cf.* AR 955 (July 15, 2011 letter) (extending the "the receipt date for proposal revisions to 2:30 PM Monday July 25, 2011").[14] Moreover, the court is not persuaded by defendant's suggestion that OPM includes a "formal" cut-off date or deadline only when requesting FPRs. *Cf.* Oral Argument of June 27, 2012, colloquy between the court and Mr. Vincent de Paul Phillips at 11:47:55–48:33 (Q: Isn't it pretty common when you're asking for further information from . . . offerors to give them a due date? A: Your honor, I can't speak to what every other agency does, but I don't believe that when you're . . . in the discussion phase that you send out typically a formal letter like this providing an express cut-off date. . . . There may be informal deadlines that are sometimes provided in e-mail discussions. . . .").

Although the July 8, 2011 letter may have conveyed some indicia of finality, *see e.g.,* AR

---

submit FPRs violated the provision in FAR 15.307(b) that " 'each offeror still in the competitive range *shall* be given an opportunity to submit a final proposal revision.' " *Id.* at 263 (quoting FAR 15.307(b)).

14. Plaintiff contends that OPM and the other offerors in the competitive range held similar views. *See* Pl.'s Reply 7–8; Pl.'s Mot. 27; Oral Argument of June 27, 2012, Argument of Mr. Timothy Sullivan at 11:26:46–51 ("[E]veryone thought this was a round of proposal revisions, but not the final round."). Plaintiff argues that "none of the other offerors interpreted OPM's request for proposal revisions as one for FPRs." Pl.'s Reply 8. As support for this contention, plaintiff points to the fact that the other offerors characterized their July 25, 2011 submissions as a "revised proposal" or a "revised volume"—rather than a "final" proposal revision. *Id.* (citing AR 3205 (CACI Response), 4003 (USIS Response), 4865 (KeyPoint Government Solutions Response)). Plaintiff contends that this "supports the conclusion that OPM's method of conveying that discussions were closed was completely ineffective and did not satisfy the fundamental requirements of FAR 15.307." *Id.*

Plaintiff also argues that "OPM itself did not treat the July 25 submissions as final proposal revisions." Pl.'s Mot. 27. Plaintiff points to an August 3, 2011 OPM e-mail proposing that OPM wait "until the next round of proposal revisions are received (Best and Final)" as a possible means of ameliorating the over-budget revised pricing proposals. Pl.'s Reply 7 (citing, inter alia, AR 7034 (Aug. 3, 2011 e-mail from Clint Hartle to James Thieme)). Plaintiff also contends that OPM's acceptance of Omniplex August 15, 2011 Submission, *see* AR 5952 (Addendum to Final Technical Evaluation Mem.); *supra* n. 9, suggests that OPM had not yet established a common cut-off date, Pl.'s Mot. 27–28; *see* Pl.'s Reply 7 ("OPM did not describe, consider or treat July 25 as a common cut-off date for FPRs."). Finally, plaintiff points to the fact that, during Omniplex's debriefing, OPM did not claim that the July 8, 2011 letter was a request for FPRs but, instead, claimed that it was under no obligation to make such a request. Pl.'s Mot. 27; Pl.'s Reply 7.

The court does not consider the subjective characterization of the July 8, 2011 letter by either OPM or the other offerors to be relevant to the court's interpretation of the July 8, 2011 letter. The court interprets the July 8, 2011 letter from what the court finds to be an objectively reasonable point of view.

The court also notes that plaintiff does not contend that OPM improperly accepted Omniplex's August 15, 2011 Submission. It follows that plaintiff has not established prejudice resulting from this potential error. *Cf.* AR 5952 (Addendum to Final Technical Evaluation Mem.) (stating that the technical evaluation team's review of Omniplex's August 15, 2011 Submission did not change Omniplex's overall technical rating).

342 (July 8, 2011 Letter) ("Your company's responses will serve as a proposal revision, becoming part of any subsequent contract between [Omniplex] and the Federal Government."), the court does not find that "a reasonable interpretation of the letter in light of ... the surrounding circumstances," *Cleveland*, 43 F.3d at 658, supports the conclusion that it was a request for FPRs. The facts here are distinguishable from those in *Cleveland*. The NASA letters in *Cleveland* were sent to offerors in the competitive range—who had already submitted their BAFOs—and stated that NASA planned to "conduct a second round of discussions." *Id.* at 657. The NASA letters specifically informed the offerors, "[W]hile the [g]overnment has no further questions or need for clarification concerning your referenced proposal, you are hereby given the opportunity to submit any amendments you may have to your referenced proposal." *Id.* In this case, OPM repeatedly indicated that questions or further discussions might follow. *See* AR 343 (July 8, 2011 letter) ("Following evaluation of your company's responses, OPM will determine whether face to face negotiations are necessary."); AR 955 (July 15, 2011 letter) ("Pending a pricing evaluation of the proposed revision, other question may arise which we will ask you to address at a later date."). Moreover, after sending the NASA letters, the contracting specialist in *Cleveland* contacted each of the offerors in the competitive range by phone "and orally gave them the same information that was contained in the [NASA letters]." *Cleveland*, 43 F.3d at 657. In contrast, the July 8, 2011 letter was followed up with the July 15, 2011 letter, which also failed to convey that discussions had closed. *See* AR 955 (July 15, 2011 letter) ("Pending a pricing evaluation of the proposed revision, other questions may arise which we will ask you to address at a later date.").

Given the foregoing, the court finds OPM failed to issue a request for FPRs in accordance with FAR 15.307(b). The court does not take the view, however, that a request for FPRs must specifically request a "final proposal revision," *cf. Cleveland*, 43 F.3d at 658, nor must it specifically state that "the [g]overnment intends to make award without obtaining further revisions," FAR 15.307(b).

The court simply finds that neither the letter nor the spirit of FAR 15.307(b), in view of the surrounding circumstances, was adhered to in this case.

2. Plaintiff Has Not Shown that, but for the Alleged Violation, Omniplex Had a "Substantial Chance" of Receiving Award

 Plaintiff has failed to establish that it was prejudiced by OPM's violation of FAR 15.307(b). To succeed on a post-award bid protest action, plaintiff must show that if OPM had properly followed FAR 15.307(b), plaintiff would have had a substantial chance of receiving an award. *See Bannum*, 404 F.3d at 1353. The court finds that, even if Omniplex had been afforded "another bite at the apple," *see* Oral Argument of June 27, 2012, Argument of Mr. Timothy Sullivan at 11:30:34–35, Omniplex's prices would not have been competitive.

Plaintiff argues that OPM's alleged violation of FAR 15.307(b) was prejudicial because Omniplex never had the opportunity "to offer its best and final pricing." Pl.'s Mot. 28. According to plaintiff, "OMNIPLEX was expecting substantive discussions regarding its price proposal and possibly its revised technical proposal, and it was prepared to lower its prices when FPRs were requested." Pl.'s Reply 8. As support for this assertion, plaintiff points to [* * *]. [* * *], plaintiff argues that Omniplex also could have lowered its prices in response to the Solicitation because "these companies will do what is necessary to meet the competitive requirements." Oral Argument of June 27, 2012, Argument of Mr. Timothy Sullivan at 11:32:52–33:06. The court does not find persuasive [* * *].

All of the offerors in the competitive range were afforded an equal opportunity to submit a revised pricing proposal in response to the July 8, 2011 letter. In the July 8, 2011 letter, OPM stated its belief that the changes made to the Solicitation would "*significantly* lower the overall price of the proposal." AR 342 (Solicitation). Indeed, three of the four offerors lowered the prices in their revised pricing proposals. AR 6049 (Pricing Evalua-

tion Mem.). Omniplex, however, increased its prices by $571 million. *Id.* Omniplex provided a detailed explanation for this price increase in the cover letter to its revised pricing proposal. AR 2037–39 (Omniplex's Revised Proposal).

In the cover letter to its revised pricing proposal, Omniplex stated that OPM's changes to the Solicitation had not afforded Omniplex the opportunity to "significantly lower its prices," and had, in fact, "result[ed] in slightly higher prices." *Id.* Omniplex offered several reasons for this increase in prices:

> [W]hen we consider the revisions to the contract term that further extend the potential support periods, the increased escalation for those periods actually results in slightly higher prices, as it [* * *].
>
> [* * *].

*Id.* at 2038. Omniplex also stated that the changes to the Solicitation—as compared to Omniplex's existing contract with OPM—would [* * *]. *Id.* at 2039.

The court agrees with defendant that Omniplex's prices appear to be "based exclusively on the company's business model, ability to leverage and absorb costs, and independent business decisions aimed at reaching internal profitability targets." *See* Def.'s Mot. 10. Plaintiff has failed to establish that, had OPM issued a request for FPRs in accordance with FAR 15.307(b), Omniplex would have submitted a competitive final proposal revision. The court therefore finds that Omniplex was not prejudiced by OPM's violation of FAR 15.307(b).

B. Plaintiff Has Not Established a Clear and Prejudicial Violation of FAR 15.306(d)

 Plaintiff also argues that OPM violated FAR 15.306(d) by failing to engage in meaningful discussions with Omniplex. *See* Pl.'s Mot. 29–36. Defendant contends that plaintiff's argument "is absurd" because OPM "directed [Omniplex] into the area of its proposal—pricing—that required amplification or correction." Def.'s Mot. 17. For the reasons stated below, the court finds that plaintiff has failed to establish that OPM violated FAR 15.306(d) and that, even if a

violation of FAR 15.306(d) were demonstrated, plaintiff has not established that Omniplex was thereby prejudiced.

As reviewed in Part III.A, discussions occur after the agency has established the competitive range. FAR 15.306(d). Discussions are conducted by the contracting officer and must be "tailored to each offeror's proposal." FAR 15.306(d)(1). "The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation." FAR 15.306(d)(2). Subject to certain exceptions, discussions must identify "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). "The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." *Id.* The contracting officer is not, however, "required to discuss every area where the proposal could be improved." *Id.* Rather, FAR 15.306(d)(3) provides that "[t]he scope and extent of discussions are a matter of contracting officer judgment." *Id.*

The original pricing proposals of the four offerors were approximately 26% to 42% above OPM's CIC-approved budget. AR 6007 (Competitive Range Determination Mem.). Because the proposed pricing could not "be absorbed by [OPM] in any manner," OPM refrained from further evaluating the offerors' original pricing proposals. *Id.; see also id.* at 6031 ("We have not evaluated the pricing at this point because, [FIS] has indicated that they cannot in any way accept the pricing which has been proposed by the [four offerors]."). FIS revised the Solicitation by "retool[ing] its performance evaluation (quality/timeliness) disincentives," and, on July 8, 2011, OPM sent the revised Solicitation to each of the four offerors in the competitive range. AR 6046 (Pricing Evaluation Mem.); *see* AR 6031 (Competitive Range Determination Mem.) (stating that, in an effort to lower pricing, FIS was "reworking the incentive, disincentive, and tolerance ranges" of the

Solicitation"); *supra* Part I.B (discussing the revised Solicitation and its attachments).

The parties agree that OPM engaged in three pricing-related communications with Omniplex. *See* Pl.'s Mot. 31 (stating that there were "three relevant communications from the OPM pertaining to price proposals"); Def.'s Mot. 16 (stating that OPM engaged in "three different communications" with Omniplex regarding its pricing proposal). Plaintiff argues, however, that none of these communications "indicated in a meaningful way that its pricing was unreasonably high, unacceptable or unaffordable."[15] Pl.'s Mot. 33. According to plaintiff, "OMNIPLEX could and would have narrowed the pricing differential between it and the other offerors had it been given the opportunity through meaningful discussions." Pl.'s Reply 10; *see* [* * *].

The first pricing-related communication from OPM to Omniplex was in the July 8, 2011 letter that accompanied the revised Solicitation. *See* AR 342 (July 8, 2011 letter); *supra* Part I.B (discussing the attachments to the July 8, 2011 letter). The July 8, 2011 letter stated that "OPM wants to ensure that the vendor is aware that several change have been made to the solicitation which we believe will *significantly* lower the overall price of the proposal." AR 342 (July 8, 2011 letter). Plaintiff contends that this statement "was made in a vendor-neutral fashion, and in a generic cover letter that was sent to every remaining offeror." Pl.'s Mot. 31. The court has already established, however, that the July 8, 2011 received by Omniplex was addressed solely to Omniplex and that none of the other offerors was copied on the letter. *See supra* Part I.B (noting that the July 8, 2011 letter was addressed to each individual offeror and that none of the offer-

ors was copied on any of the letters or associated e-mail); *accord* Pl.'s Reply 6. Included with the July 8, 2011 letter were several requests and questions directed at Omniplex's technical proposal. AR 344–46 (July 8, 2011 letter).

The second pricing-related communication from OPM to Omniplex was in the July 15, 2011 letter, which consisted primarily of OPM's reply to Omniplex's questions regarding the revised Solicitation. *See* AR 952–55 (July 15, 2011 letter); *supra* Part I.B (discussing the July 15, 2011 letter). One question posed by Omniplex was whether OPM had any "specific pricing questions/clarifications for OMNIPLEX," given that OPM had not identified "any specific questions/clarifications" with respect to Omniplex's original pricing proposal. AR 955 (July 15, 2011 letter); *see also id.* (noting that the July 8, 2011 letter "did not identify specific questions/clarifications within [sic] respect to OMNIPLEX's original pricing submission"). OPM responded by stating that, "[d]ue to the numerous changes to the solicitation," OPM expected "the pricing proposal [to] be significantly changed and resubmitted in its entirety." *Id.*

The July 15, 2011 letter also included the third pricing-related communication from OPM to Omniplex. The July 15, 2011 letter documents an exchange between Omniplex and OPM in which Omniplex expressed uncertainty regarding the "correlations that would result in *significantly lower* pricing, as stated in OPM's [July 8, 2011 letter]," given that "the underlying scope/coverage/reporting requirements of all CLIN products remain unchanged" in the revised Solicitation. *Id.* Omniplex therefore "request[ed] further guidance from OPM as to the process and interpretation—and also the range esti-

---

15. Plaintiff also argues that "if OPM was attempting to convey its significant concern that the initial pricing could not be absorbed by the Agency in any manner through these communications, the message was evidently lost on *all four* of the competitive range offerors." Pl.'s Mot. 33 (internal quotation marks omitted). Plaintiff contends that all of the offerors "missed the magnitude of OPM's pricing concern and no *significant* price reductions were made." *Id.* at 34; *see id.* (stating that "OPM made awards based upon evaluated prices that ranged from

$253 million to $948 million over" the five-year $2.456 billion budget approved by OPM's CIC); *see generally supra* n. 6 (discussing the budget approved by the CIC).

The court does not consider relevant the subjective characterization of OPM's communications by the other offerors to the court's interpretation of OPM's communications. The court interprets OPM's communications from what the court finds to be an objectively reasonable point of view.

mates" of OPM's price evaluation, so that Omniplex could "present fully competitive pricing to OPM" in its revised pricing proposal. *Id.* OPM responded with the following: "The majority of Section F: Deliveries or Performance, has been changed. Contractors should carefully examine the revisions to [the] solicitation, especially the changes to Section F, and provide a revised pricing proposal (as appropriate). . . ." *Id.*

The court finds that OPM's communications with Omniplex adequately convey that OPM found Omniplex's original pricing proposal to be either deficient or to contain a significant weakness. *See* FAR 15.306(d)(3). OPM repeatedly stated that it expected that the changes made to the Solicitation would lead Omniplex to "*significantly* lower the overall price of [its pricing] proposal." AR 342 (July 8, 2011 letter); *accord* AR 955 (July 15, 2011 letter) ("Due to the numerous changes to the solicitation, it is our opinion that the pricing proposal will be significantly changed and resubmitted in its entirety."). The court finds unpersuasive plaintiff's argument that, instead of conveying its concern that Omniplex's original pricing was unacceptably high, each of OPM's communications simply directed Omniplex to changes made in the Solicitation. *See* Pl.'s Mot. 31–33; Pl.'s Reply 11–12. Although OPM's communications with Omniplex certainly could have been more forthcoming—especially given Omniplex's request for further guidance regarding its pricing proposal, *see* AR 955 (July 15, 2011 letter); *see also* AR 2038 (Omniplex's Revised Proposal)—FAR 15.306(d)(3) affords the contracting officer discretion in determining "[t]he scope and extent of discussions," FAR 15.306(d)(3). Moreover, the record demonstrates that Omniplex recognized that OPM considered its

original pricing proposal to be an area of concern: Omniplex explained in detail why it was unable to "significantly lower its prices" in its revised pricing proposal. AR 2037–39 (Omniplex's Revised Proposal).

Even if the court were to find that OPM had violated FAR 15.306(d), plaintiff has not established that it was prejudiced by this alleged violation.[16] Had OPM explicitly informed Omniplex that its original pricing proposal revision was unacceptably high, the court is not persuaded that Omniplex would have submitted a competitive pricing proposal revision. *See supra* Part III.A.2.

Given the foregoing, plaintiff has not established that that OPM failed to engage in meaningful discussions with Omniplex in violation of FAR 15.306(d). *See* FAR 15.306(d)(3). The court finds that the three communications from OPM to Omniplex sufficiently identified the Omniplex's pricing as a deficiency or significant weakness in accordance with FAR 15.306(d). *See id.* Plaintiff has not shown that it would have had a substantial chance of receiving an award but for the alleged violation of FAR 15.306(d). *Cf. Bannum,* 404 F.3d at 1353.

C. Plaintiff Has Not Persuaded the Court that that OPM's Evaluation of Omniplex's Technical Proposal Was Unreasonable

 The Solicitation provided that awards would be made on a best-value basis, AR 210 (Solicitation), and that technical considerations would be considered more important than cost considerations, *id.* at 223. OPM rated USIS as "acceptable with a low risk for award," AR 5944 (Final Technical Evaluation Mem.); *see* AR 5952 (Addendum to Final Technical Evaluation Mem.) (stating

---

16. The court therefore declines to analyze the merits of plaintiff's argument that "OPM failed to conduct meaningful discussions with OMNIPLEX regarding the past performance evaluation." *See* Pl.'s Mot. 35. FAR 15.306(d)(3) provides that discussions must include "adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). Prior to establishing the competitive range, OPM received a past performance evaluation in which Omniplex's performance in [* * *]. AR 5523–24 (Omniplex Past Performance Questionnaire). Plaintiff claims that this

"clearly influenced OMNIPLEX's past performance ratings . . . yet, OMNIPLEX was not given any opportunity to address that adverse information during discussions." Pl.'s Mot. 36; *cf.* Pl.'s Reply 13 ("The agency's failure to allow OMNIPLEX to respond to this adverse information— which influenced OMNIPLEX's ratings under each technical factor in this best value procurement—constitutes a failure to engage in meaningful discussions."). Plaintiff is unable to demonstrate any prejudice resulting from defendant's alleged failure to discuss with Omniplex its [* * *] past performance rating.

that the original rating assigned to USIS had not changed), CACI and KeyPoint as "acceptable as is with a low risk for award" and Omniplex as "conditionally acceptable as submitted with a moderate risk for award," AR 5953 (Addendum to Final Technical Evaluation Mem.). According to plaintiff, the lower rating given to Omniplex's technical proposal "clearly played a role in OPM's decision not to pursue further discussions and issue a request for FPRs." Pl.'s Reply 14. Plaintiff argues that OPM's "indefensible technical evaluation was clearly prejudicial to OMNI-PLEX." *Id.; see* Pl.'s Mot. 39 (claiming that "notwithstanding OMNIPLEX's higher overall price, it would have been more difficult for OPM to justify discarding a higher-rated technical proposal under the FPR's evaluation and award scheme").

Plaintiff suggests that it would not have been eliminated from competition absent the "flawed and unreasonable" evaluation of Omniplex's technical proposal. Pl.'s Mot. 39. Plaintiff raises two arguments in support of this contention. First, plaintiff claims that OPM "irrationally penalized" Omniplex's technical proposal because Omniplex did not obtain pre-certification or pre-approval of two of its internal information technology (IT) systems: Omniplex's case management system and Omniplex's online training program (collectively, IT systems).[17] *See id.* at 36–37. Plaintiff maintains, and defendant agrees, that the Solicitation did not require pre-certification of IT systems prior to award. *Id.* at 36; *see* Def.'s Mot. 22 ("The solicitation discusses that certification of the offerors's [sic] information systems is re-quired, but it does not state that certification had to occur before award."). The Solicitation provides: "Prior to any OPM information being transferred to the contractor's IT system, the contractor's IT system must have completed the appropriate OPM approved Security Assessment and Authorization." AR 876 (Solicitation). Plaintiff argues that "[u]nder this provision, offerors could presumably seek security certifications during the transition period or thereafter if other approved systems … could be used instead." Pl.'s Mot. 36–37. Plaintiff also claims that OPM treated Omniplex in a "prejudicially disparate manner" because OPM "could have, and should have, simply addressed [Omniplex's case management system and training program][18] administratively following contract award, as OPM decided to do with respect to several of CACI's and KeyPoint's weaknesses." *Id.* at 38 (footnote added).

Plaintiff's second argument is that OPM "repeatedly penalized [Omniplex] for the same alleged weaknesses" in its technical proposal, *id.*, thereby "improperly increasing the significance of certain factors," *id.* at 39. Plaintiff contends that OPM's evaluation of certain factors within Omniplex's technical merit section—its investigative materials and security plan, organization and management plan, and implementation and start-up plan—was negatively affected by the fact that Omniplex's case management system had not yet been certified.[19] *Id.* at 38. Plaintiff further contends that Omniplex's failure to obtain pre-approval of its training program also influenced OPM's evaluation of Omniplex's im-

---

17. Omniplex refers to its case management system as IRMA, which stands for Investigative Resource Management Application. AR 1389 (Omniplex Proposal). Plaintiff defines IRMA as "OMNIPLEX's proprietary automated case management system … which contains dynamic quality assurance and program management tools." Pl.'s Mot. 6. Omniplex refers to its online training program as LMS, which stands for Learning Management System (LMS). AR 1464 (Omniplex Proposal). Plaintiff defines LMS as "a software program that administers, documents and tracks training." Pl.'s Mot. 6.

18. With respect to Omniplex's online training program, plaintiff contends that "[a] rational evaluation would have contemporaneously as-sessed the merits of the training plan submitted by OMNIPLEX." Pl.'s Mot. 37. Plaintiff explains that because Omniplex had recently changed the training plan used in its existing contract with OPM, "and those changes had not yet been approved, OMNIPLEX was unfairly penalized." *Id.* at 38.

19. Plaintiff also claims that OPM's evaluation of Omniplex's quality control plan was negatively affected by Omniplex's failure to obtain pre-certification of its case management system. Pl.'s Mot. 38. Although OPM noted that Omniplex's case management system had not yet been certified by OPM, OPM rated Omniplex's quality control plan as acceptable. AR 5931–32 (Final Technical Evaluation Mem.).

plementation and start-up plan and staffing and training plan. *Id.* at 38–39.[20]

Plaintiff has failed to meet the "unusually heavy burden of proof" necessary when challenging an agency's technical determination. *Cf. Cont'l Bus. Enters., Inc.*, 196 Ct.Cl. at 637, 452 F.2d at 1021. The court does not find persuasive either of plaintiff's arguments—that OPM "irrationally penalized" Omniplex for not obtaining pre-certification of its IT systems, *see* Pl.'s Mot. 36–38, or that OPM "repeatedly penalized [Omniplex] for the same alleged weaknesses," *see id.* at 38–39. Of the eight factors in the technical merit section of Omniplex's technical proposal, OPM rated [* * *]. AR 5932–34 (Final Technical Evaluation Mem.). The [* * *] rating given to Omniplex's [* * *] factor was not in any way affected by Omniplex's failure to obtain pre-certification of its IT systems. *See id.* at 5934. The [* * *] rating given to Omniplex's [* * *] appears to have been only minimally influenced by Omniplex's failure to obtain pre-certification of its case management system. *See id.* at 5932–33. Under these two factors, OPM identifies several weaknesses unrelated to Omniplex's case management system and only points to the fact that Omniplex had provided [* * *] if, in fact, approval of Omniplex's case management plan were delayed or denied. *See id.* The court does not perceive how, as plaintiff claims, *see* Pl.'s Mot. 36, plaintiff was "irrationally penalized" by OPM.

Omniplex's failure to obtain pre-approval of its training program does appear to play a more significant role in OPM's rating of Omniplex's staffing and training plan factor. *See* AR 5934 (Final Technical Evaluation Mem.) (listing at least two weaknesses unre-

lated to pre-approval of Omniplex's training program); *accord* AR 5953 (Addendum to Final Technical Evaluation Mem.) (discussing "numerous concerns" with respect to Omniplex's training program that are not related to OPM's approval of the program). OPM noted that Omniplex's revised technical proposal had not yet been approved and that Omniplex "assume[s] that the approval of their training plan will be prioritized, but OPM cannot guarantee the order of the approval or that the training plan will be approved." AR 5934 (Final Technical Evaluation Mem.); *accord* AR 5953 (Addendum to Final Technical Evaluation Mem.) (stating that "the time required to approve the submitted [training] plan is a concern"). OPM's consideration of Omniplex's failure to obtain pre-approval of its training program—under a factor dedicated to examining the offeror's staffing and training plan—does not appear unreasonable to the court.

Finally, although Omniplex's failure to obtain pre-certification and pre-approval of both its case management system and its training program also appears to have had a relatively greater impact on the [* * *] rating given by OPM to Omniplex's [* * *], the court does not find that OPM's considerations irrationally penalized Omniplex with respect to its [* * *]. *See* AR 5933 (Final Technical Evaluation Mem.) (listing several weaknesses unrelated to pre-certification or pre-approval of Omniplex's IT systems). OPM notes that Omniplex's [* * *], which OPM considered to be [* * *], had not yet been certified, and also notes that Omniplex's [* * *]. *Id.; see id.* ("The I.T. systems are not [certified] and there is [* * *]. OPM cannot grandfather their I.T. system as the

20. Plaintiff also maintains that a [* * *] past performance rating Omniplex received from [* * *] was "triple-counted: first in the past performance evaluation; second, under the key personnel factor ...; and third, under the corporate capabilities factor." Pl.'s Mot. 39; *see id.* at 36 (discussing the [* * *] past performance rating). The court finds it reasonable for OPM to have considered Omniplex's [* * *] past performance rating under the past performance section. *See* AR 5935 (Final Technical Evaluation Mem.); *cf. supra* n. 16 (finding that, if OPM failed to engage in meaningful discussions with Omniplex regarding its [* * *] past performance rating, plaintiff has not established prejudice). Under the key

personnel factor, OPM simply notes that one of Omniplex's proposed managers was manager during the period in which the quality of Omniplex's past performance [* * *]. AR 5934 (Final Technical Evaluation Mem.). The court does not find this consideration to be unreasonable. And the record does not support plaintiff's contention that OPM considered plaintiff's [* * *] past performance rating in its evaluation of Omniplex's corporate capabilities. *See id.* The only potential source of plaintiff's claim is OPM's statement that "[Omniplex's] [p]roposal claims [* * *]." *Id.* The court does not find this statement to be unreasonable.

[certification] process has not been completed."). The court does not find either of these considerations to be unreasonable. Plaintiff has failed to establish that OPM's consideration of Omniplex's failure to obtain pre-certification or pre-approval of its IT systems under Omniplex's implementation and start-up plan was an unreasonable or irrational exercise of discretion.

■ Plaintiff has failed to demonstrate that OPM's evaluation of Omniplex's technical proposal was irrational or unreasonable. *See generally Baird Corp.*, 1 Cl.Ct. at 664. Therefore, the court will not substitute its judgment for that of OPM. *See id.* "As the Federal Circuit has explained, challenges concerning 'the minutiae of the procurement process in such matters as technical ratings ... involve discretionary determinations of procurement officials that a court will not second guess.'" *Beta Analytics,* 67 Fed.Cl. at 395 (alteration in original) (quoting *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996)).

## IV. Conclusion

For the foregoing reasons, plaintiff's motion for judgment on the administrative record is DENIED, and defendant's cross-motion is GRANTED. The Clerk of Court shall enter judgment for defendant. No costs.

IT IS SO ORDERED.